## Crick, County Judge, et al. v. Rash.

(Decided March 11, 1921.)

### Appeal from Hopkins Circuit court.

1. Counties—Elections—Proceedings Preliminary to Issue of Bonds. —In elections called and held under the provisions of section 157a of the Constitution, the election may be called at the first regular term of the court after the filing or lodging of the petition asking therefor with the county judge, and if filed on that day it is competent for the election to be called at that term; nor is it necessary to the validity of the election that the proposition voted on should receive two-thirds of the votes cast in that election, since a majority of the votes is sufficient to carry the proposition. Neither is it necessary for such an election to be held on the regularly provided election day for the election of officers, since it may be held on any day fixed in the order calling it if the requisite notice is given.

2. Counties—Proceedings Preliminary to Issue of Bonds.—Orders made by the fiscal court after such an election, looking to the preparing, executing and selling of the bonds and to the custody, handling of, and expending the proceeds, are legislative in their nature and may be rescinded or modified at a subsequent term of the court.

3. Counties—Duty of Fiscal Court in Sale of Bonds.—Under section 4307 of the statute it is the duty of the fiscal court to sell the bonds voted at such an election for not less than par and accrued interest and all of the proceeds arising therefrom must be used for the purposes for which the bonds were voted.

4. Counties—Fiscal Courts—Powers of.—Fiscal courts possess only such power and authority as are expressly conferred upon them by law and such other powers by implication as are imperatively necessary in order to carry out their conferred express authority.

5. Counties—Fiscal Courts—Sale of Bonds—Commissions.—Fiscal courts, therefore, by implication have the authority to employ

brokers and pay them reasonable commissions to effect a sale of road bonds voted by the electors of the county pursuant to the section of the Constitution referred to, after it has made unsuccessful bona fide efforts to, itself, make the sale; but even in that case the fiscal courts possess no authority to contract or agree for the payment of a commission greater than is ordinarily and usually charged for similar services in transactions between individuals; and where the contract agrees to pay a commission of 5% on the gross amount realized, when the customary charge for similar services between individuals is far less than the compensation agreed upon, the execution of the contract will be enjoined in a proper action filed for the purpose.

6.   States—Limitation of Amount of Indebtedness or Expenditure.—Section 49 of the Constitution forbids the General Assembly from contracting debts, except for the purpose of meeting deficits or failures in the revenue, for which purposes debts direct or contingent, singly or in the aggregate to the amount of $500,-000.00 may be contracted, but the moneys arising therefrom shall be applied only to the purpose or purposes for which they are obtained or to repay the debt or debts so contracted.

7.   States—Limitation of Amount of Indebtedness or Expenditure.—Section 50 of the same instrument forbids the contracting of any debt by the General Assembly, or it authorizing the contracting of any debt, except for the purposes stated in section 49, without making provision at the time for the collection of an annual tax sufficient to pay the interest and to discharge the debt within thirty years, and that before the act shall take effect it shall be submitted to the people of the state at an election and receive a majority of the votes cast therein.

8.   States—Limitation of Amount of Indebtedness or Expenditure.—A debt within the meaning of the constitutional provisions, is any obligation to pay money on the part of the state at some fixed future time, or a time which may, become definite and fixed by act of either party and which act they expressly or impliedly agree to perform in the contract creating the debt; but the inhibitions of the constitutional provisions do not apply to, or include debts so contracted in anticipation of and which may be paid out of, the revenues of the state already levied or to be collected for the fiscal year in which the contract is made; nor to a debt so contracted to be paid out of revenue already in the treasury for the purpose; nor to a debt to be paid out of a special fund, provided such special fund is not and never becomes the property of the state; but it is not competent for the legislature to indirectly evade the constitutional provisions under the latter rule, by providing that the debt shall be paid out of a specially designated fund insufficient at the time and which itself is a part of the revenues of the state and which is collected under the authority of the legislature to levy and collect taxes.

9.   States—Limitation of Amount of Indebtedness or Expenditure—Loans by Counties.—The loans or advancements by the various

counties of the state to the Commonwealth under the provisions of section 11 of chapter 17, Acts 1920, page 76, constitute debts of the state within the meaning of the two sections of the Constitution referred to, and if such debts in the aggregate, together with other outstanding obligations of the state, may not be met or paid by anticipating the revenues of the state for the year or with money in the treasury available for road purposes, or out of any special fund, as above defined, they are prohibited by said sections of the Constitution and are void.

10. States—Aid to Counties for Construction of Roads.—Section 157a of the Constitution did not in any manner repeal either section 49 or section 50 of that instrument so as to authorize the state to contract debts with the counties to an unlimited amount for the purpose of constructing roads. The only effect of the newly adopted section was to permit the state to extend to the counties its credit for the construction of roads, but which credit was only such as the Constitution allowed and which it could not extend to the counties for that particular purpose (section 177, Constitution) before the adoption of section 157a.

CHARLES I. DAWSON, Attorney General, W. T. FOWLER, Assistant Attorney General, HOBSON & HOBSON and LETCHER R. FOX for appellants.

J. F. GORDON, M. K. GORDON, CHAS. G. FRANKLIN, V. Y. MOORE and W. H. YOST for appellee.

GEORGE B. WINSOLOW and JOHN B. HOWE, Amicus Curiae.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming in part and reversing in part.

The appellant Crick (one of the defendants below) is the county judge of Hopkins county, and he and the other appellants, who were also defendants below, as members of the fiscal court of the county, with other officers and persons deemed necessary parties, were sued below in this action by the appellee and plaintiff below, James R. Rash, a citizen and taxpayer of the county, to obtain an injunction restraining defendants from issuing, selling or disposing of any part of a $500,000.00 road bond issue which had been authorized by an election in the county wherein a majority of the voters endorsed the proposition, upon the alleged grounds of, (1) irregularities in calling the election, (which was held under the provisions of section 157a of the Constitution) and (2) because of alleged fatal irregularities in the orders of the fiscal court made and entered after the election. A further injunction was asked restraining

the fiscal court from carrying into execution a contract which it had entered into of record with Caldwell & Company, a firm of brokers in Nashville, Tennessee, wherein the fiscal court agreed to pay the firm 5% commission for the sale by it, at par with accrued interest, of $200,000.00 of the proposed bonds, the commission to be paid out of the general funds of the county and not from the proceeds of the sale; and the fiscal court was also asked to be enjoined from turning over, advancing or lending to the state highway commission, as an agent of the Commonwealth, and for the use and benefit of the latter, any part of the proceeds of the bond issue which the fiscal court had proposed and offered to do to the extent of $150,000.00, as provided in section 11 of chapter 17, Acts 1920, page 76, which section will be later referred to and such parts thereof as are pertinent to the questions raised will be inserted in this opinion. A demurrer was filed to the petition by defendants which the court overruled and they declining to plead further the court sustained the motion for the injunction *in toto* and granted to plaintiff all the relief he asked, and this appeal calls in question the soundness of that judgment.

We could, with propriety, dismiss all of the objections to the validity of the election and to the orders of the fiscal court made thereafter as alleged and relied on in the petition under grounds (1) and (2) above, since none of them is even mentioned by counsel for appellee in their brief, much less are they relied on for a reversal of the judgment, and it would therefore appear that each of them is abandoned on this appeal, if indeed, they were ever urged with serious earnestness. As alleged in the petition, they are numerous, under each of the numbered grounds, (1) and (2), and most of them are so highly technical as to demonstrate their immateriality. The principal objections as to the validity of the election under ground (1), are: (a) That the petition signed by the requisite number of citizens asking for an order by the county judge calling the election was not filed at a regular term of the county court, nor did it lie over from one term of that court till the next one before the election was called; (b) that the election was not held upon the regular November election day but on a special day named in the order; (c) that the proposition to issue the bonds received on the day of the election only a majority of the votes cast therein and not two-thirds there-

of, as plaintiff claims was necessary, and (d) that the petition asked for an issue of the bonds "for the purpose of building roads *and bridges*," while the order of the court calling the election stated that the money raised from the sale of the bonds should be used for the construction or reconstruction of roads, omitting the use of the word "bridges." As heretofore stated, many other objections, equally as unmeritorious as the one last mentioned, are stated in the petition, and to undertake to set out and dispose of each of them could not possibly be of any service to any one and would lengthen this opinion far beyond proper limitations. Objection (d) might be effectually answered by saying that enough appears in the order calling the election to show that the intention was to use the proceeds of the bonds, if voted, in constructing or reconstructing "roads *and bridges;*" but if the word "bridges" was not referred to therein it would be construed to be included in the term "roads," so that, when the court in calling the election directed that the proceeds of the bonds to be voted should be used for the purpose of constructing or reconstructing roads, *bridges* were necessarily included. Objection (c) has been denied by this court in a number of cases, some of the latest of which are: Cleary v. Pieper, 169 Ky. 434; Huston v. Boltz, *idem*, 640; Denton v. Pulaski County, 170 Ky. 33; and Armstrong v. Fiscal Court of Carter County, 169 Ky. 433, wherein this court held that an election for the issual of road bonds, held under the authority conferred by section 157a of the Constitution, did not require more than a majority of the votes cast upon the proposition in order to confer the authority upon the fiscal court to issue them, and that it was not necessary for the proposition to receive two-thirds of the votes cast as is required in elections held under section 157 of that instrument. That objections (a) and (b) are without merit is shown by this court's opinions in the cases of Walsh v. Asher, 163 Ky. 379; Albright v. Ballard, 164 Ky. 768; Finley v. Rose, 165 Ky. 408, and Bowman v. Fayette County, 168 Ky. 524.

Under ground (2) relied on in the petition in support of the injunction, the principal objection is that the fiscal court changed its orders a number of times after the entry of a prior one and after the adjournment of the court, which orders related to various admin-

istrative matters pertaining to the sale of the bonds, such as the appointment of commissioners for the handling of the proceeds, the roads upon which such proceeds, or portions thereof should be expended, and other matters of similar nature. It is insisted that the fiscal court being one of record had no jurisdiction to change any of such orders after they had been made and after the term of court at which they were made was adjourned. But a sufficient answer to all this is that in the case of Commonwealth v. Beauchamp, 136 Ky. 227; Crittenden County Court v. Shanks, 80 Ky. 475, and Scott v. Forrest, 174 Ky. 672, we held that the orders of the fiscal court as are here involved were legislative in their nature rather than judicial and that they were subject to be revoked, modified or altered at a subsequent term of the court, provided such modification, alteration or renunciation did not affect previously acquired rights of any one who acted upon the faith of their original entry.

The objections referred to are the only ones urged against the validity of the issuance of the bonds, even remotely or faintly possessing merit; from which it results that the court erred in overruling the demurrer to that part of the petition seeking to enjoin the fiscal court from issuing the bonds pursuant to the election, and the injunction to that extent should not have been granted.

This brings us to a consideration of that part of the petition seeking to enjoin the fiscal court and Caldwell & Company from executing or carrying out in any manner or to any extent, the contract for the sale of $200,-000.00 of the voted bonds for a commission of 5% of the gross proceeds of the sale, to be paid out of the general funds of the county. The rule, universally applicable to, and circumscribing the power and authority of fiscal courts, and other governing authorities of counties, is that they can exercise no power or authority which is not expressly conferred upon them by the Constitution or a statute, and such implied powers as are imperatively necessary to execute those so expressly conferred. This rule applicable to the powers and authority to such subdivisions of the state is so thoroughly fixed in the jurisprudence of this country as that we scarcely deem it necessary to fortify the statement with authorities. Some of the later cases from this court sup-

porting the doctrine are: Breathitt County v. Hammonds, 150 Ky. 502, 42 L. R. A. (N. S.) 836; Ann. Cas. 1914D, 514; Russell County v. Hill, 164 Ky. 360; Mills v. Lantrip, 170 Ky. 81, and Riddell v. Boone County, 183 Ky. 77. Section 4307 of the Kentucky Statutes, 1915 edition, prescribes that the character of bonds involved in this case shall be issued and sold from time to time by the fiscal court, i. e., the duty is imposed by that section on the fiscal court not only to issue such bonds, but to sell them after they are issued. It is insisted, however, that neither the county judge nor any other member of the court is required by that section to perform such duties in person, but that they impliedly have the authority to employ others to perform them, and we are not prepared to say that under certain circumstances and conditions this may not be true. The same section also provides, ''That all the money raised by the sale of bonds shall be used solely and alone for the building, construction or reconstruction of roads,'' etc. It is therefore, insisted by the plaintiff that this requirement forbids the payment of any part of the proceeds of the sale as commissions or expenses in effecting it, and that it is incompetent for the fiscal court to violate that requirement by resorting to the subterfuge of paying such commissions or expenses out of the general funds of the county, as was attempted to be done in this case. We are not inclined to give to the above quoted requirement of section 4307 such a strict and literal interpretation as would deprive the fiscal court of the authority to incur such expenses as are absolutely necessary in order to effect a sale of the bonds, and which are incurred in carrying out the general scheme and plan for which the election was held. Rather are we inclined to hold that it was the intention of the legislature in enacting that provision to restrain the fiscal court from applying any of the proceeds of the sale of the bonds referred to, to any other purpose than that for which the bonds were voted. To hold otherwise would prevent the fiscal court from paying the expenses of the election, the court costs and fees incident to calling it and for making the necessary orders carrying out the purpose of the election, the printing and engraving of the bonds, and other absolutely essential and necessary acts for the acceptance by the voters of the rights and privileges conferred by the legislature in authorizing the election. Any expenses,

therefore, coming within the general class referred to may be legally paid by the fiscal court out of the gross proceeds of the sale of the bonds, but any which do not come within that general class may not be so paid; nor do we think it competent for the fiscal court to endeavor to circumvent the meaning of the statutes by directing such unauthorized payments to be made out of the general funds of the county. Such action is manifestly the barest sort of subterfuge. The effect of it would be to make the taxpayers of the county pay them out of one pocket when the fiscal court has no authority to require them to be paid out of the other one. The rule that the substance shall be looked to rather than the shadow forbids such circumlocution and we do not, therefore, attach any importance to that part of the order of the fiscal court now under consideration, directing that the commissions to Caldwell & Company shall be paid out of the general funds of the county and not from the proceeds of the sale of the bonds. But, it does not necessarily follow that the fiscal court under certain circumstances and emergencies would not be authorized, under its specific authority to sell the bonds, to pay a reasonable and customary commission to agents or brokers who may be engaged to effect the sale. We are cited by counsel for the fiscal court to the cases of Church v. Hadley, 145 S. W. 8, 240 Missouri 680; State v. Duluth Land Co., 75 Minn. 456; Paul v. Seattle, 40 Wash. 294; Manitou v. First National Bank, 37 Colo. 344; Davis v. San Antonio, 160 S. W. (Texas) 1161; Koochinching Co. v. Elder, 176 N. W. 195 (Minnesota, decided Feb. 6, 1920); Hunt v. Fawcett, 8 Wash. 396; Uhler v. Olympia, 87 Wash. 1, and Smith v. County of Los Angeles, 99 Cal. 28, in support of the right of the fiscal court to carry out the contract with Caldwell & Company in this case, and it must be admitted that at least some of the cases referred to recognize the validity of such a contract, notwithstanding the existence of statutory limitations on the power and authority of the fiscal court in such matters such as prevail with us. But in others of the cases the court construed the local statutes to confer such authority. We do not deem it necessary to review those cases, or to differentiate the facts of those opinions, in so far as they are different from those presented here, because we do not find ourselves able to agree with the doctrine announced in some of them upholding the right

of fiscal courts, under circumstances similar to those here presented, because of implied authority, to employ brokers for the purpose of selling municipal bonds for an agreed compensation largely in excess of the usual and customary charges for such services, and that, too, without its being demonstrated that the fiscal authority had in good faith made unsuccessful efforts to effect a sale. In the instant case the fiscal court had advertised a time and place for the sale of the bonds of Hopkins county on at least two different occasions. The advertisement was, not only locally circulated in newspapers and by handbills, but it was inserted in periodicals of wide circulation and devoted exclusively to the business of advertising for the buying and selling municipal bonds. On neither of the occasions was there a purchaser who offered par and accrued interest for any of the bonds, which was the least price, under the statute, that the fiscal court could accept. Under those circumstances we think the implied authority exists for the fiscal court to employ commissioners or brokers to make the sale of such an amount of the bonds as are immediately needed, provided the agreed commission should not exceed that which is usually and ordinarily charged, at the time, for similar services in similar transactions between individuals. We know, as a part of the current history of the country, that at the time the contract with Caldwell & Company was entered into brokerage commissions for the services proposed to be rendered by that firm to Hopkins county were about ⅛ of one per cent. The agreed commission, therefore, of 5% for the amount of bonds proposed to be sold by Caldwell & Company was grossly excessive. In conferring "necessarily implied" authority upon such bodies as fiscal courts it should be limited so as to require them when acting for the public to be guided by such economical considerations as govern similar transactions in the commercial world between individuals. To sanction a contract like the one here involved would open the door for the perpetration of fraud by prospective bidders and render it possible for them to enter into a collusive agreement or conspiracy to decline to make or offer bids, either privately or at the publicly advertised sale, in the hope of procuring a discount by obtaining a contract for exorbitant commissions to be divided, perhaps, between

or among the parties to the agreement and who might also share a division of the bonds when purchased. To uphold the contract would pave the way, and open opportunities for the gratification of the already too prevalent desire to commit graft wherever and whenever possible upon the public treasury. If such an opportunity is to be extended we prefer that there should be more explicit authority for it than what we find in our statute. What has been said, however, will not prevent a fiscal court, or the body whose duty it is to sell the bonds, after making *bona fide* efforts to do so without success, from agreeing to pay a reasonable commission for the services, to be measured as heretofore indicated. Nor is it intended by anything said herein to reflect upon any of the members of the Hopkins county fiscal court in entering into the contract with Caldwell & Company, since the record thoroughly demonstrates that they acted under the *bona fide* belief that they possessed the authority to do so, and that the contract was for the best interest of the people of the county. On this branch of the case it is our conclusion, based upon the reasons stated, that the judgment appealed from properly enjoined the execution of the contract as made with Caldwell & Company.

This brings us to the last, as well as the most serious, question involved in the case, which is the power or authority of the fiscal court to advance or loan to the state $150,000.00 of the proceeds of the bonds. The record, as made up in the court below, was not in condition to technically present the question, since some necessary facts for its determination were not included therein. But the Commonwealth, by agreement of parties, has come into the case, and an agreed stipulation to which it is a party has been made part of the record, which stipulation contains the omitted facts, and we have concluded, because of the importance and public nature of the case, and at the earnest solicitation of all parties concerned, to treat the record as formally made up and to dispose of the question presented.

It is claimed that the authority of the fiscal court to lend or advance the $150,000.00 to the state is contained in that portion of section 11 of the 1920 act, *supra*, saying:

"If any county desires to construct any part of any primary road before the state may construct same under

the plan and system herein designated, such county shall make request of the state highway commission so to do. When such request is made, the state highway commission shall immediately investigate such request, and, if they find that the county has funds available to construct any part of such road, and will pay for the construction thereof, the state highway commission may take up immediately the construction of such road, but they shall not do so until the county has taken such steps as they may require to make available subject to their order sufficient funds to pay for the construction of such road. When the county has satisfied these requirements, the state highway commission may proceed to construct such road in the same way and manner, under the same regulations that they construct other roads as herein provided. They shall keep careful account of the money thus advanced by the county to the state, and when the project of which such road is a part shall have been completed, the state shall refund to the county the full amount of money thus advanced upon proper certification of the state highway commission."

Prior to the passage of that act there was in operation in this state what was generally known as the "State aid" road plan. The roads in the various counties, built under that plan, were strictly county roads to the construction of which both the state and county contributed.

The 1920 act in its first four sections authorized the state highway commission, which the act created, to carry out all contracts which had been entered into under the state aid plan, or which might be entered into under it on or before July 1, 1920, and authorized the commission to bind the state for its part of the cost of construction of such roads under contracts entered into up to that time. Beginning with section 5 of the act an entirely new scheme on the part of the state for the construction, reconstruction and maintenance of roads was enacted. That scheme was to divide the entire state into "Road Projects" (about seventy in number) and other parts of the act provided that all the roads constituting any part of any of the "projects" should be strictly and exclusively state roads, for neither the construction nor the maintenance of which the counties were responsible. On the contrary, the maintenance of them, after they were constructed, was imposed "entirely upon the state." In section 9 of the act it is provided in substance

that the state highway commission shall begin the construction of the various projects and prosecute the work "as rapidly as finances are available for that purpose, due regard being given to the maintenance of roads built during preceding years under state aid or otherwise which have been incorporated in this system of state highways or which have been constructed under this act." The "finances available for that purpose," as used in the section, necessarily refer to finances which are constitutionally available, as hereinafter shown, since the legislature could not authorize the state highway commission to make "available" finances by creating a debt upon the state contrary to the provisions of the Constitution as judicially interpreted; and, whether the latter is or may be done, under section 11 of the act, is the question presented for determination.

There can be no reasonable doubt that the purpose of the legislature, in incorporating in the act the quoted portion of section 11 above, was to provide a method by which the construction of the state highways, provided for in the act, might be facilitated and the roads built before the state or its highway commission could procure or become possessed of immediate "finances available for that purpose" from the general revenues of the state, whether they were specifically set apart to the road fund or not; otherwise there would have been no necessity in permitting the state to construct the road with money belonging to the county, since if there was in the state treasury available funds for the purpose there would be no occasion for obtaining those funds from the respective counties.

Section 49 of the Constitution authorizes the general assembly to contract debts to meet casual deficits or failures in the revenues, but limits the amount of such indebtedness, even for that purpose, and whether directly or contingently contracted, either singly or in the aggregate, to the sum of $500,000.00. And, it furthermore provides that the proceeds of loans creating such debts shall be applied only to the purpose or purposes for which they were obtained, which is "casual deficits or failures in the revenue." The following section (50) says:

"No act of the general assembly shall authorize any debt to be contracted on behalf of the Commonwealth except for the purposes mentioned in section forty-nine,

unless provision be made therein to levy and collect an annual tax sufficient to pay the interest stipulated, and to discharge the debt within thirty years; nor shall such act take effect until it shall have been submitted to the people at a general election, and shall have received a majority of all the votes cast for and against it; provided, the general assembly may contract debts by borrowing money to pay any part of the debt of the state, without submission to the people and without making provision in the act authorizing the same for a tax to discharge the debt so contracted, or the interest thereon.''

So, the first question to be determined is whether the authorized advancement to the state by the various counties therein of funds for the construction of roads, as provided by section 11 of the 1920 act, is the creation by the state of a debt, as is contemplated by section 50 of the Constitution. The rule for the interpretation of constitutions, as universally applied, is that the language therein is to receive its plain and ordinarily understood meaning by the generality of the people. Constitutions are many times actually, and always in theory, adopted by the people and their language is presumed to contain the meaning which the people generally attribute to the words employed. In this respect the rules for the interpretation of constitutions differ from the ones applied in the construction of statutes. Lake County v. Rollins, 130 U. S. 662, and notes on page 232, 44 American State Reports.

Guided by this rule and the authorities hereafter considered, there is no room to doubt that the obligations, which the state incurs through its state highway commission to the respective counties, which may advance to it money or funds for the construction of the highways provided for in the 1920 act, create both in fact and in law ''debts'' on the part of the state to the extent of the sums so advanced; but whether they are such as is forbidden by the Constitution must be determined upon other facts to be hereafter considered. In 1 Bouvier's Law Dictionary, title ''Debt,'' it is said: ''There is no doubt of the meaning of the word 'debt' as used in the law. It means 'something owed;' 'something due or to become due upon express or implied agreement.' '' In the case of Brashear v. Madison, 142 Ind. 685, 33 L. R. A. 474, it is said: ''No good reason, however, has been

advanced to show that the word (debt or indebtedness) in this connection (in the Constitution) should have any other than its ordinary signification, that is, the contraction of an obligation for which there is no present means of payment." The question is extensively dealt with and completely covered in lengthy annotations to the cases of Ottumwa v. City Water Supply Co., 59 L. R. A. 604, 109 Fed. 315; Superior Manufacturing Co. v. School District Number 63, 37 L. R. A. (N. S.) 1054, 28 Okla. 293, and Anderson v. International School District Number 5, 1917E L. R. A. 428, 32 N. D. 413.

In 25 R. C. L. 398, the text says:

"The phrase 'shall never contract any indebtedness,' as used in state constitutions, limiting the amount of indebtedness which a state may lawfully contract, includes, any obligation which the state undertakes or is obligated to pay or discharge out of future appropriations; that is, appropriations not made by the legislature creating the debt or obligation, and to be paid from moneys to be derived from levies other than those made by the then existing legislature, which must necessarily be raised by levying a tax upon the property of the entire state, as distinguished from a mere city, county or district levy." And in vol. 19 of the same work, page 979, in defining the word "indebtedness" used in constitutions and as applicable to the obligations of municipalities, the text says:

"Under a constitutional provision that no municipality shall incur an indebtedness beyond a certain amount the word 'indebtedness' should be given its ordinary signification, that is, the contraction of an obligation for which there is no present means of payment, and it is not confined to obligations in the form of bonds or other written evidences of indebtedness or having their origin in loans, but includes every indebtedness arising upon contract whether express or implied."

See also notes to the case of Beard v. City of Hopkinsville in 44 Amer. St. Rep., page 230, the case reported on page 222. In the note referred to is this statement: "The word (debt or indebtedness) is to be given its fair and legitimate meaning, and not restricted to obligations in the form of bonds and other written evidence of indebtedness. (Citing cases.) So far as any general definition may be given, it may be said that every indebtedness arising upon contract, whether express or

implied, and by virtue of which a city is under obligation to pay money to a person, whether natural or artificial, is within these prohibitions, unless funds are on hand or, at least, provided for the payment of such indebtedness out of the current revenues of the municipality." See also cases of O'Bryan v. City of Owensboro, 113 Ky. 680, and Stanley v. Townsend, 170 Ky. 833, and cases referred to therein. We deem it unnecessary to further refer to or quote from either opinions or text writers. When section 11, of the 1920 act provides that the state shall refund to the county the amount of money advanced by it when the "project," of which the road through the county is a part, is completed, evidenced by the ccritficate of the state highway commission, the certificate becomes an obligation of the state to the county and it can not be classified or defined in any other way than as evidencing an indebtedness of the state to the county to be paid when the "project" of which the road is a part is completed.

But it yet remains to be seen whether such a debt is forbidden by the sections of the Constitution, *supra,* for, as will be seen, from the Stanley case and others referred to therein, an obligation, although amounting to a technical debt, is not forbidden by those sections, if (a) provision is made in the act creating it for its payment, or (b) if funds are already in the treasury to meet it, or (c) if the uncollected revenue provided for the year in which it is created will be sufficient to meet it when collected. Those cases, as well as all of the other authorities hereinbefore referred to, hold, that although the payment of an obligation is deferred, if it is created under the circumstances of either (a), (b) or (c) above, it is not a debt within the meaning of the constitutional provisions limiting indebtedness and the state, through the legislature or otherwise, may lawfully create it. On the contrary, if no provision is made in the act creating or authorizing the creation of the indebtedness for its payment, or if there is no money available in the treasury to meet it, or if the revenues already provided and to be collected for the year in which it is created are, or will be, insufficient to meet it and all other outstanding ones against the particular fund so provided or to be collected when collected, the debt is unauthorized and is uncollectible.

Another instance in which the debt will not contravene the constitutional limitations, or be an obligation contrary to its provisions, is when it is payable out of a *special fund,* and it is upon this ground that counsel seriously rely to save the obligations which the state incurs under the provisions of section 11 of the act under consideration, from coming within the provisions of either sections 49 or 50 of the Constitution, since it is claimed that the state's obligations to the counties (created as provided in section 11 of the act) are to be paid out of the special road fund of the state. We have searched the act in vain to find where it is provided that the cost of constructing the state system of roads, therein provided for, is payable exclusively out of any special road fund; but if it should be assumed that such was the case it would not sustain counsel's contention, since the "special fund," out of which a debt shall be paid in order to relieve it from the operation of the limiting provisions of the Constitution, is a fund which does not belong to the state, county or other municipality contracting the debt, but which belonged to others and to which the holder of the debt must look for its payment. Illustrations of such *special payment* funds, effectual to relieve the indebtedness from the constitutional inhibitions, are charges and liens against abutting property for improvements constructed or contracted for by the municipality. Another illustration is to be found in the case of Tartar v. Skaggs, 184 Ky. 58. There the county of Edmonton contracted for the construction of roads, the total amount of which was more than the county could incur under constitutional provisions, but 75% of the cost of the construction was to be paid by the state under the state aid law, and the county in its agreement with the contractor did not obligate to pay that three-fourths, but only obligated itself to pay one-fourth (its part of the construction) and to *collect* from the state the other three-fourths and pay it to the contractor when collected. We held that the portion of the cost of the construction due from the state was a *special fund* and could not be taken into account in measuring the authority of the county under the Constitution to contract. The annotations, *supra,* to the cases referred to in the L. R. A. reports, cover the entire field touching the question under consideration and there is not found in any of them a single case where

the authority contracting the debt may specialize a fund out of which it may be paid at some time in the distant future when it becomes due, and thus validate the debt, although exceeding the constitutional limitations, upon the ground that it is payable out of a "special fund."

Under this contention the legislature, or the debt contracting authority, could divide the public revenue into numerous subdivisions calling one the "Road fund," another the "School fund," another the "Agricultural fund," another the "Public Health fund," and others almost without limit. Debts could then be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack as violating constitutional provisions limiting indebtedness, provided each debt was made payable out of some one of the specially designated funds into which all of the revenue collected by taxation from the people had been divided. A mere statement of the proposition carries with it, it seems to us, its own refutation.

Were we to uphold this contention it would be equivalent to lending our support to the merest subterfuge practiced for the purpose of evading a most healthy and wholesome provision of the Constitution; for it must not be forgotten that the debt limit provisions of state constitutions were adopted and were designed to remedy a rapidly growing evil of extravagance on the part of the various states, as well as of municipalities. There was a great haste to obtain and become possessed of advantages enjoyed by older and wealthier states, communities and municipalities and to gratify such desires contracts and projects were recklessly entered into under the name of public improvements and many communities and counties, as well as states, found themselves in almost a hopeless state of bankruptcy. Therefore, as said in 37 L. R. A. (N. S.) *supra,* 1061: "The courts have shown a disposition to uphold the debt limit provisions in the spirit in which they were enacted, although various schemes have been devised to evade them." And on page 1062 the annotator says: "The history of both states and municipalities since the adoption of the pay-as-you-go policy beyond a certain limit has been satisfactory, proving the wisdom of limiting public expenditure, and showing that there is no reason why these provisions should not be rigidly

enforced." As especially bearing upon the "special fund" payment feature of the question we refer to the Ottomwa case, *supra,* and to that of State v. Candland, 140 Amer. St. Rep. 834, 24 L. R. A. (N. S.) 1260, 36 Utah 406.

The inevitable conclusion from what has been said, therefore, is that when the state highway commission accepts an advancement of money from a county and issues its certificates therefor to be paid by the state when the project is completed, whether out of the special road fund or not, the debt of the state thereby created is valid, if at the itme there is a sufficient fund in the state treasury not otherwise appropriated, anticipated or contracted against, out of which the certificate may be paid, or if there will be available in the treasury at any time during the year in which the contract is made, from sources already provided for, funds sufficient to meet not only that debt but the aggregate amount of all others outstanding and similarly or otherwise created; but when the aggregate indebtedness, thus or otherwise created, equals the funds in the treasury available for their discharge, or equals the amount of revenue for the purpose provided for the year, although not collected, after deducting a reasonable sum for deficits or losses in failing to collect, debts thereafter created in anticipation of, or to be paid with revenues to be collected or provided for future years, are prohibited by the sections of the Constitution, *supra,* and are therefore void.

It is insisted, however, that section 157a of the Constitution, adopted in 1909, repealed by implication sections 49 and 50 of that instrument in so far as to remove all limit upon the indebtedness which the state might incur to the counties for the construction of roads. We can not agree with this contention. The transaction here involved is not a pledging of the state's credit, or a lending of the state's credit to the counties as contemplated by the section of the Constitution referred to. But, if it were otherwise, the contention of counsel would not necessarily follow. The main, if not the only, reason, as we have seen, for providing for debt limitations was to curb the extravagant spirit of the people, which had been chiefly manifested in the construction of improvements such as roads; and if the contention of counsel should be upheld the effect would be to prac-

tically repeal altogether sections 49 and 50 of the Constitution, a result which we are confident was never intended or contemplated by the legislature in submitting the amendment, nor by the people in voting for and adopting it. Constitutions like statutes are to be construed so that all parts of them may stand together, and if section 157a was even susceptible of the interpretation insisted on by counsel, it would be our duty to reconcile it with the other two sections referred to, and to hold that the *credit* of the state, mentioned in section 157a, which it might pledge or loan to the county, was only such credit as is contemplated in, or as is measured by, sections 49 and 50 of the Constitution, and that which it may have provided itself with, according to the provisions of those sections, as interpreted by this court, and in view of other revenue sections. Prior to the adoption of section 157a the state could not loan its credit to the counties for the construction of roads. (Section 177 Constitution.) It is clear to our minds that it was not intended by the adoption of that section to increase the credit of the state for any purpose beyond that provided by existing sections, but on the contrary, it was intended to allow the state to use its credit, as theretofore fixed and prescribed, for a purpose which it could not do before the adoption of section 157a.

The stipulation of the parties shows that at the time of the proposed advancement to the state of Hopkins county of the $150,000.00 in question, there was a total revenue, constitutionally available to the state highway commission, of $4,400,000.00; $2,500,000.00 of which was received or due to be collected from state sources, and $1,900,000.00 of which represented the sum receivable from the federal government. It is further stiplated that the total aggregate amount of applications by counties under the 1920 act at the time of the one here under consideration did not exceed $1,037,000.00 as the sum proposed to be advanced by all the applying counties to the state. But it is further stipulated that a number of other counties are contemplating making applications to advance money to the state for the construction of roads "which additional applications will exceed $2,000.000.00." Such applications, if made by the counties, with those already made will amount to a total sum of $3,037,000.00, leaving only $1,363,000.00 (without making deductions for

losses) which the state might expend on its system of roads above what it borrowed from the counties; for if it expends any money other than that advanced by the counties such expenditure must be charged against the "available funds" as above outlined. Since, therefore, the proposed debt of $150,000.00 of the state to Hopkins county may be paid out of the revenue on hand, or out of that which is available for the fiscal year in which it is contracted under provisions of law existing at the time of the contract or advancement, the state may lawfully agree to refund it and the borrowing of that sum by the state is not the creation of a debt which is inhibited by the constitutional provisions.

There being then nothing to prevent the state from creating the debt, under the circumstances, the only remaining question is, may the county of Hopkins lend that sum to the state? The terms of the 1920 statute are broad enough to confer such authority upon the fiscal court of the county and we have been cited to no provision in the Constitution forbidding it. The money is advanced by the county in the interest of a public improvement within its borders and with the construction and maintenance of which it is relieved by the undertaking of the state. The purpose therefore of the expenditure of the money is a local governmental one and we know of no reason why the county, if it is competent for the state to borrow, might not make the loan for such a purpose.

We are perfectly cognizant of the quite prevalent feeling throughout the state for the improvement of roads, in which feeling we most heartily share, but in order to gratify it we dare not cut ourselves loose from the moorings of the Constitution; nor should the possibility that this opinion might result in impairing some existing obligations in a manner which it is not necessary here to mention, influence our opinion. The effect of which would be to say that one violation of the Constitution authorizes both the legislature and the courts to tolerate another, which is clearly untenable. Furthermore, we are not justified in violating the obligations of our oaths of office either to meet a public demand or to render harmless the consequences resulting from an unconstitutional statute.

If the people of the state desire to spend money for public improvements or other purposes, in a sum beyond

the available revenue of the state and contrary to the limitations imposed by sections 49 and 50 of the Constitution, the legislature has the authority to provide means whereby it may be done. Section 171 of that instrument places no limit on the rate of taxation which the legislature may impose for state purposes, and money collected from that source and perhaps others, such as sharing in fines for misdemeanors, are the only sources from which revenues for the state are derived; and if a greater sum of money than is thereby collected is desired to be spent the only way to obtain it is, not by borrowing it, but by raising the rate of taxation, or bonding the state by a vote of the people, as provided in section 50 of the Constitution. In this manner all desired improvements may be obtained and either paid for at the time or in the future with proceeds of loans which the people endorsed.

Summing up the whole matter, our conclusion is that the bond issue involved was legally voted; that the proposed loan or advancement by Hopkins county to the state is, because of facts hereinbefore discussed, likewise valid, but the contract which the fiscal court of the county entered into with Caldwell & Company is invalid. The injunction should therefore be modified so as to permit the fiscal court to issue the bonds and to advance to the state for the purpose and in the manner indicated by section 11 of the statute, the sum of $150,-000.00, and the judgment is reversed with directions to make the modifications indicated, but it is affirmed as to the Caldwell & Company contract. The whole court (except Judge Clarke, who was absent) considered the case and all members concur.