# Billeter & Wiley v. State Highway Commission, et al.

(Decided May 6, 1924.)

## Appeal from Franklin Circuit Court.

1. Constitutional Law—State Cannot Impair Obligation.—A state cannot pass a law impairing obligation of contract.

2. State—Commission Cannot Let Contracts Aggregating in Ultimate Cost More than Revenue of Current Fiscal Year.—State highway commission cannot let contracts aggregating in ultimate cost more than revenues of current fiscal year though they do not require an expenditure in any one fiscal year in excess of available funds for that year, under act approved March 16, 1920 (Laws 1920, c. 17), sections 3, 9.

3. Constitutional Law—States—Taxation—General Assembly has all Legislative Power Not Reserved or Inhibited—No Limitation on Amount or Duration of Taxes that it May Levy.—The General Assembly has all legislative power not reserved or inhibited by constitutional provision and,. subject to its own right of amendment or repeal, and consistent with same right in its successor, there is no limitation on amount or duration of taxes that it may levy or expend, but it may not incur indebtedness in excess of $500,-000.00, in view of Constitution, sections 49, 50.

4. Constitutional Law—Language to Receive Plain Meaning.—In interpreting Constitutions language is to receive its plain and ordinarily understood meaning by generality of people.

5. States—What Constitutes "Indebtedness" of State.—If appropriations or other obligations, such as highway contracts, assumed during any fiscal year, aside from governmental expense, exceeds. revenues of that year, such excess constitutes an "indebtedness," within Constitution, sections 49, 50.

6. States—Limit of State Indebtedness.—If indebtedness of state arises from casual deficits or failure in revenues, it may be valid to extent of $500,000.00, but no more, unless authorized by vote of people, as provided by Constitution, section 50, and any deficit existing at end of previous year must be included.

7. States—Legislature May Not Authorize Highway Commission to Let Contracts Aggregating in Ultimate Cost More than Revenues of Two Years.—Legislature may not authorize state highway commission to let contracts aggregating in ultimate cost more than. revenues of two years, of its term, though such contracts will not: require expenditure in any one year in excess of available funds. for that year, since it cannot tie its successor's hands by making: future levies.

8. States—Construction and Maintenance of Highway not "Governmental Expense."—State highway may not let contracts aggregating in ultimate cost more than revenues of current fiscal year under theory that commission is arm of government and con-

struction and maintenance is· "governmental expense" in form of continuing appropriations.

9. States—Federal Aid Might Properly be Considered in Estimating Available Revenue in Highway Commission.—In view of evidence, held, that federal aid could be properly considered in estimating available revenue of state highway commission in determining extent to which it may contract.

10. States—Donations which May be Considered in Estimating Available Revenue of State Highway Commission.—County donations, money in hands of trustees, or when donations have been made legally by solvent counties, may be considered in estimating available revenue of state highway commission.

11. States—Tax on Gasoline and License Tax Considered in Estimating Available Revenue of State Highway Commission.—Tax on gasoline and license tax on automobiles are sufficiently certain to be considered in estimating available revenue of state highway commission to determine extent to which it may contract during one fiscal year.

BLAKEY, DAVIS & LEWIS for appellants.

FRANK E. DAUGHERTY, Attorney General, OVERTON S. HOGAN, Assistant Attorney General, WOODWARD, WARFIELD & DAWSON, JOHN D. CARROLL, LESLIE W. MORRIS, G. W. GOURLEY, J. G. VALLANDINGHAM for appellees, and' SELDEN Y. TRIMBLE, amicus curiae.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

On the 10th day of December, 1923, the state highway commission let a number of contracts for the construction of state highways, at an estimated cost of $2,994,618.35. At that time there existed prior contracts for such construction; the estimated cost of completing these being the sum of $8,395,234.23. In addition there were outstanding state warrants and claims against the department for sums expended for road construction between June 30, 1923, and December 1, 1923, amounting to $2,266,788.66.

Asserting that these items in the aggregate constituted an indebtedness far in excess of the gross amount of all the revenue and resources of the department for the fiscal year 1923-24, one of the contracting firms filed this suit to test the validity of the December contracts.

The commission virtually admits this situation, but insists:

First: That it may let contracts aggregating in ultimate cost more than the revenues of the current fiscal

year, provided it does not let contracts which will require an expenditure thereunder in any one fiscal year in excess of the available funds for that year; due allowance having been made for other fixed charges required to be paid out of that year's revenue, and that it has kept within this rule.

Second: That the amount of its resources for the present fiscal year is equal to the amount the state will have to pay on these contracts and all other legal charges against the road fund for the current fiscal year.

Third: That road construction is a governmental expense, the highway commission an arm of the government and not prohibited from making such expenditures.

Certain interested counties have intervened seeking to uphold the validity of the contracts, and a brief to the contrary has been filed on behalf of the people by an *amicus curiae.*

The personnel of the commission has changed since December 10, but no criticism is offered as to the manner in which the contracts were awarded or as to the necessity existing therefor, and it appears that the present commission as represented by the learned attorney general desires the approval of the contracts.

The evidence of the chief engineer and auditor of the commission is to the effect that of the contracts executed December 10, 1923, the federal government and counties were obligated to pay $986,387.23, leaving a balance for the state's part of $1,908,230.42; that of the contracts theretofore executed the federal government and counties were obligated to pay $7,043,260.30, leaving a balance of $1,351,973.93 as the state's obligation.

The contracts call for payments to be made as the work progresses and not exceeding 60% of the work to be performed under contracts let prior to December 10, nor more than 30% of that to be performed under contracts of that date, can be performed before June 30, 1924, and figures are produced to show that the available revenue for the current fiscal year will cover those amounts, and pay all obligations maturing during that period.

As to the second proposition, he estimates the revenue, legal charges and contracts let during the present fiscal year at:

### Revenue

| | |
|---|---:|
| Three cent *ad valorem* tax | $800,000.00 |
| Automobile license tax | 3,000,000.00 |
| Gasoline tax | 700,000.00 |
| Surplus on hand at beginning of fiscal year | 516,118.14 |
| Total | $5,016,118.14 |

### Expenditures

| | |
|---|---:|
| State's part of contracts let prior to Dec. 10, 1923 | $1,351,973.93 |
| State's part of contracts let Dec. 10, 1923 | 1,908,230.42 |
| Office expenses | 50,000.00 |
| Field expenses | 200,000.00 |
| Installment on old state aid debt | 185,148.50 |
| Already expended for maintenance | 841,000.00 |
| Necessary to expend for maintenance to June 30, 1924 | 100,000.00 |
| | $4,636,352.85 |

### Recapitulation

| | |
|---|---:|
| Total available revenue | $5,016,118.14 |
| Total expenses | 4,636,352.85 |
| | $379,765.29 |

In view of the outstanding contracts at the beginning of the fiscal year, and of the work thereon, resulting in the warrants and claims for $2,366,786.66 alluded to above, we doubt if the $516,118.14 surplus in the above table should have been credited. If we omit this, a comfortable surplus would be changed to a small deficit, even if the correctness and validity of every item of resource is conceded. Some of these are questioned and will be referred to later, but we do not think this question of controlling force.

It is admitted that the warrants and claims mentioned are valid obligations, and considering them, the excess of obligations over the revenues of the present fiscal year will reach approximately $2,000,000.00. This will be due and payable during the fiscal year, beginning June 30, 1924, and we shall presently see that no levy or

appropriation had been made for it at the time the contracts were executed. So that the real question to be determined is, as to the power of the commission to contract as claimed in the first proposition, *supra*. In other words, does this future obligation create a present indebtedness that is prohibited by the Constitution or by the statute?

The commission was created by an act approved March 16, 1920, which in part provides:

> "Section 3. In addition to the foregoing enumerated powers and duties it shall be the duty of the state highway commission to perform any and all other duties imposed upon them by this or any other act, and particularly shall it be their duty to cause to be done all things necessary to construct and maintain the system of primary roads hereinafter designated, and where there is no provision of the law covering any necessary thing to be done in the construction and maintenance of said roads, they shall do such necessary things in the way and manner best calculated, in their judgment, to accomplish the necessary objects, and it is intended that the provisions contained in this act shall be treated as restrictions on their powers and not a delegation of power, that is, but for the act they could have plenary powers, and they may do all things necessary in the construction and maintenance of said roads, except where the power to act is denied or restricted by law."

> "Section 9. . . . The state highway commission shall begin the construction of the system of state highways from these cities and towns as nearly simultaneously as possible, and shall prosecute the work on any or all projects radiating out from these centers as rapidly as finances are available for that purpose. . . ."

The legislature meets biennially. Under the budget system it makes a separate appropriation for each year, two such acts being passed each session, though if it fails to act the old appropriation continues. Clearly under that act funds are not available for use prior to the fiscal year for which the appropriation is made, and section 9, of the highway act, *supra,* does not contemplate the prosecution of road construction until such "finances are available."

Under this act the commission may contract for road work for the entire biennial period by providing for work to be performed and payment to be made each fiscal year, not to exceed the amount of the revenues for that year; but this cannot be extended beyond that period, as the act contemplates a new budget at each legislative session.

True, if at any session no action is taken the old appropriation continues for two years, but the legislature reserves the option to exercise its discretion, and in its wisdom may change the appropriation or alter, amend or repeal the act creating the commission itself.

A state cannot pass a law impairing the obligation of a contract, and if the commission may make a *valid* contract for revenues accruing beyond the 30th of June of the second fiscal year of the biennial period, as no act could be passed impairing such contract, the commission might thus defy the legislature and nullify its power. Indeed, if it possesses power to contract at all beyond the limit suggested, then it may make such contracts for any period of time it desires and may by present contract exercise entire control over all highway revenues and expenditures for years to come.

The act quoted above rightfully gives to the commission broad and plenary power in its sphere of action, but it is not to be considered that the General Assembly thereby intended to surrender its power of future legislation upon the subject, and we do not think the act susceptible of that construction, as it must be construed with reference to existing limitations upon appropriations.

Aside from this could the legislature authorize the commission to make such contracts?

It must be noted that the General Assembly has all legislative power not reserved or inhibited by constitutional provision. Subject to its own right of amendment or repeal and consistent with the same right in its successor, there is no limitation on the amount or the duration of the taxes that it may levy. Further, to the extent of the revenues provided there is no limit upon its expenditures, but there is an inhibition against *it* incurring an *indebtedness* in excess of $500,000.00, to-wit:

"Section 49. INDEBTEDNESS THAT MAY BE CREATED. The General Assembly may contract debts to meet casual deficits or failures in the revenue; but such debts, direct or contingent, singly or in the ag-

gregate, shall not at any time exceed five hundred. ($500,000.00) thousand dollars, and the moneys arising from loans creating such debts shall be applied only to the purpose or purposes for which they were obtained, or to repay such debts; provided, the General Assembly may contract debts to repel invasion, suppress insurrection, or if hostilities are threatened, provide for the public defense.''

"Section 50. INDEBTEDNESS: SUBMISSION OF QUESTION. No act of the General Assembly shall authorize any debt to be contracted on behalf of the Commonwealth except for the purposes mentioned in section 49, unless provision be made therein to levy and collect an annual tax sufficient to pay the interest stipulated and to discharge the debt within thirty years; nor shall such act take effect until it shall have been submitted to the people at a general election, and shall have received a majority of all the votes cast for and against it; provided, the General Assembly may contract debts by borrowing money to pay any part of the debt of the state, without submission to the people, and without making provision in the act authorizing the same for a tax to discharge the debt so contracted, or the interest thereon.''

Attention may be called to the fact that the provisions of these sections are far different from those of sections 157-158, relating to the power of municipalities to levy taxes and make expenditures, and for that reason the many able opinions construing the latter provisions are of but little aid in the determination of this question.

As to what constitutes an indebtedness within the meaning of these provisions: ''The rule for interpretation of constitutions as universally applied is that the language therein is to receive its plain and ordinarily understood meaning by the generality of the people.'' Crick v. Rash, 190 Ky. 820, quoting from Lake County v. Rollins, 130 U. S. 662.

Consistent with this it has been held:

Furthermore, revenues of the state assessed and in the process of collection may be considered as constructively in the treasury and may be appropriated and treated as though actually and physically there,

and an appropriation of them by the legislature does not constitute the incurring of an indebtedness within the meaning of section 49." Rhea v. Newman, 153 Ky. 604.

The same rule applies to deficits created by appropriations for governmental expense and the maintenance of state institutions. Hagar v. Gast, 119 Ky. 502; Hagar v. Ky. Children's Home Society, 119 Ky. 235; James, Auditor v. State University, 131 Ky. 173; Rhea v. Newman, 153 Ky. 604, and to continuing appropriations of this character which are gratuities that may be discontinued, reduced or changed at the pleasure of the legislature. James and Hagar cases, *supra.*

A legislative issue and sale of bonds in the sum of $500,000.00, the funds to be used in paying obligations, created in the maintenance and improvement of charitable institutions, has been held to be an indebtedness contracted to meet a casual deficit as provided in section 49. Eastern Ky. Lunatic Asylum v. Bradley, 101 Ky. 551.

Appellees insist that this is the only form of indebtedness contemplated by the constitutional provisions, and that they apply only to loans and borrowing of money.

In response to a similar argument made in Rhea v. Newman, *supra,* it was said:

"It must be admitted there is force in the argument and there are expressions found in the recent opinions which would seem to sustain it, at least in a measure."

But later in the same opinion it is said:

"We do not mean to be understood as saying that an appropriation may not constitute a debt. It may be of such a character as to have all the essential elements of a contract, and in such a case, unquestionably it would be a debt; but under the authorities quoted above, an appropriation which merely authorizes the payment of a gratuity, or is made in support of one of the state institutions, or to create or maintain a useful arm of the state government or to defray the ordinary or current expenses of the state, does not constitute a debt such as is prohibited by section 49 of the Constitution. . . ."

"If the legislature should borrow or appropriate a hundred thousand dollars for some purpose other than the ordinary expenses of the government, and

the amount thus borrowed or appropriated would carry the indebtedness of the state beyond the constitutional limit, the act would be unauthorized. . . . ''

In the latter particular this case is followed and the above definition of a debt emphasized in Stanley v. Townsend, 170 Ky. 833, and Crick v. Rash, 190 Ky. 820.

The Gast case arose over an improvement at the blind asylum; Hagar v. Ky. Children's Home Society, an appropriation to that society; the James case, an appropriation for certain educational institutions. All of these were state institutions, and in holding that such appropriations did not create an indebtedness in the constitutional sense, it was unnecessary to decide what would create such a debt.

The Bradley case involved a loan to pay casual deficits, and the opinion holds that an indebtedness was thus created, but does not intimate that a loan is the only indebtedness contemplated by section 49.

In the Townsend case the controversy was over an act for the borrowing of money upon certificates which were held to have all the earmarks of an ordinary bond.

It will be observed that the question here involved did not arise in any of those cases; yet, while not of controlling force the definition of the word "indebtedness" therein given is entitled to consideration.

In the Crick case the highway commission entered into a contract with Hopkins county under the provisions of the act of 1920, by which the county constructed a primary highway in accordance with the state regulations, and under an agreement with the state highway commission that it would refund to the county the amount of $150,000.00 of the money expended by it on the project.

The question there as here, was as to whether or not that obligation created an indebtedness in the sense in which that word is used in sections 49 and 50. It may be distinguished in that there was no provision for progressive payment, and it did not appear how long it would require to construct the highway.

As to whether this created an indebtedness, the court said:

''  .  .  .  An obligation, although amounting to a technical debt, is not forbidden by those sections,

if (a) provision is made in the act creating it for its payment, or (b) if funds are already in the treasury to meet it, or (c) if the uncollected revenue provided for the year in which it is created will be sufficient to meet it when collected. Those cases, as well as all of the authorities hereinbefore referred to, hold that although the payment of an obligation is deferred, if it is created under the circumstances of either (a), (b) or (c) above, it is not a debt within the meaning of the constitutional provisions limiting indebtedness, and the state, through the legislature or otherwise, may lawfully create it. On the contrary, if no provision is made in the act creating or authorizing the creation of the indebtedness for its payment, or if there is no money available in the treasury to meet it, or if the revenues already provided and to be collected for the year in which it is created are, or will be, insufficient to meet it and all other outstanding ones against the particular fund so provided or to be collected, when collected, the debt is unauthorized and is uncollectible.''

''. . . The inevitable conclusion from what has been said, therefore, is that when the state highway commission accepts an advancement of money from a county and issues its certificates therefor to be paid by the state when the project is completed, whether out of the special road fund or not, the debt of the state thereby created is valid, if at the time there is a sufficient fund in the state treasury not otherwise appropriated, anticipated or contracted against, out of which the certificate may be paid, or if there will be available in the treasury at any time during the year in which the contract is made, from sources already provided for, funds sufficient to meet not only that debt but the aggregate amount of all others outstanding and similarly or otherwise created; but when the aggregate indebtedness thus or otherwise created equals the funds in the treasury available for their discharge, or equals the amount of revenue for the purpose provided for the year, although not collected, after deducting a reasonable sum for deficits or losses in failing to collect debts thereafter created in anticipation of, or to be paid with revenues to be collected or provided for future years, are prohibited by the sections of the Constitution, *supra,* and are therefore void.''

As suggested above the exact question involved in this case did not appear in the Crick case, and there may be some expressions used in that case that are applicable to municipalities rather than to the state, but the basic proposition therein decided and emphasized was, that an indebtedness in the constitutional sense may be created in this way, and such is the tenor of all the decisions.

We conclude that if the appropriations or other obligations assumed during any fiscal year aside from governmental expense exceed the revenues of that year, such excess constitutes an indebtedness, within the meaning of the Constitution.

If such indebtedness arises from casual deficits or failure in the revenues it may be valid to the extent of $500,000.00, but no more, unless authorized by a vote of the people as provided by section 50.

Further, that in estimating the amount of such indebtedness any valid deficit existing at the end of the previous year must be included, together with the deficits in all departments, aside from governmental expense, and the aggregate of all will constitute the amount of the indebtedness.

However, the legislature may levy taxes for more than one year and appropriate the revenue it thus creates, provided the payments are so allotted that such appropriations, together with the other state obligations accruing during any fiscal year, will not exceed the revenue of that year. But such acts are subject to amendment or repeal and one legislature cannot in this matter control the action of its successor, nor tie its successor's hands by making future levies, and appropriating the revenues to be derived therefrom.

Certainly it cannot make appropriations for future years for which no levies have been made, nor can it authorize the commission to contract for expenditures to be made on such basis.

If under legislative sanction, the commission should contract for the expenditures of revenue to be created by a succeeding legislature, necessarily such action would not be an ''appropriation'' and such contracts would be invalid.

To take a further step, if the legislature attempted to levy such future taxes and to authorize the commission to contract for the expenditure of the revenue thereby derived, and the commission did this, such action would

lead to "confusion worse confounded," as the next legislature might repeal both the levy and the appropriation. If under such circumstances such contracts should be upheld, the power of repeal would be denied to the legislature and it would be rendered impotent and the commission thus given greater power than the legislature. We therefore conclude that the legislature may not authorize contracts for the expenditures of revenue beyond the biennial period of its existence.

In this view of the case, contracts conditioned as indicated in appellee's proof might have been let at any time between the effective date of the 1922 budget and June 30, 1924, to cover the biennial period ending June 30, 1924; and if the last legislature continued the budget provision, similar contracts might be let at any time after the effective date of that budget up to June 30, 1926; to cover the biennial period ending June 30, 1926.

The contracts in controversy were let prior to the last session of the legislature. They provided for the payment of about $2,000,000.00 out of the revenues of the fiscal year beginning June 30, 1924, and for the reasons indicated above they are invalid.

It is urged that the commission is an arm of the government, and these expenditures governmental expenses in the form of continuing appropriations, and that on the authority of the James and Rhea cases, *supra,* they should be upheld as governmental expense. It may be said that the cases cited uphold appropriations for "governmental expense," and for the "maintenance of the penal, charitable and educational institutions of the state."

The James case involved the validity of an act making a continuous appropriation for three years to educational institutions of the state. The power to make a contract for future revenues was not considered. The court held that this was a governmental expense and an appropriation, one of the reasons assigned being that it was a mere gratuity that could be repealed at the pleasure of the legislature. That opinion is authority against the contention that future revenues may be anticipated in making contracts such as this.

The inclusion of the state fair as such in the Rhea case was a liberal interpretation of those terms, but no decision can be found in which it is intimated that highway construction and maintenance is a governmental expense; or that the highway commission is a state institu-

tion in the sense claimed, and in Nelson County v. Mc-Crocklin, 175 Ky. 199, it was directly held that the construction and maintenance of public roads and bridges is not a governmental expense. Powers of a fiscal court were considered in that case, but the definition of governmental expense there given is applicable here.

For a state to exist, its executive, legislative and judicial departments must function, and its charitable, penal and educational institutions must continue, and the expense arising from the proper conduct thereof constitutes a state obligation, even in the absence of legislative provision therefor. While good roads are a great convenience to the public and an absolute necessity for some purposes, it is a far cry to say that the construction and maintenance of all the public highways, including millions of dollars in expenditures, is a governmental expense and a fixed charge upon the state, and we must conclude it is not.

We have not overlooked the argument, that it requires extensive preparation and facilities to properly construct state highways, and that contractors can afford to construct a large road unit at a relatively lower price per mile than a short one; that in our climate the working season is short and large units cannot be completed in one year.

That for this reason it has been the policy of the commission to let a sufficient number of projects running through a longer period of time, payment to be made as the work progresses.

In this way it has secured lower prices on contracts and has been enabled to use the revenues as they arise; that if this policy be reversed, the number of short time contracts at higher rates will be increased, or the commission will be required to have on hand funds sufficient to pay in full for large units at the time the contracts are made, even though not more than 50 per cent of the work can be completed during that fiscal year, all of which will hamper the work, raise the cost of construction and decrease the efficiency of the commission.

This is plausible, but we are of the opinion that the effect is overestimated. Under the above construction, at some periods contracts may be let for as long as two years, and in actual operation we think but little injury will result in this way, and a fair understanding of all parties as to their respective rights should prove beneficial.

Further, while good roads are necessary for the development of the state, and every laudable attempt for their construction is to be warmly commended, it is well to proceed along practical lines, and thus avoid possible future involvement.

Revenues for two years may be fairly approximated, but no one can foresee the future. If appellees' contention should be adopted as law, a commission might make contracts far in the future on the basis of present revenues. Suppose such contracts were made on an estimated revenue of eight million dollars annually; that in the meantime a panic should ensue, prices decline and the revenue drop to four million dollars for a fiscal year, in which work was performed under a contract calling for double that sum. The validity of such contracts under such circumstances might involve all sorts of legal entanglements, and if upheld, involve the state in heavy indebtedness, and prove disastrous to all concerned; but regardless of the question of policy it is the duty of the court to construe the constitutional provisions according to their plain intent and meaning, and we have endeavored to do this.

While the case must be reversed for the reasons above indicated there are a number of minor questions raised affecting the various items of revenue and resources relied on by the commission, a determination of which is important for its future guidance.

First: As to government aid and county donations.

It appears that all contracts for construction are made by the commission in accordance with state plans and specifications and the construction is under its supervision; that federal aid projects are approved by the federal government; that the funds are set aside by the government and available before it approves such project, but payment is made only as construction progresses and is approved by it.

As to county donations, the evidence of the commission is to the effect that no contracts are made by the state until the counties' share has been fully secured, or its payment assured, though it is not entirely clear in this respect, Mr. Boggs stating:

"If a solvent county we take their resolution" (the fiscal court.) "If there is any likelihood of its going by default we make them put up the money

with a trustee. . . . In a great many instances it is actually deposited in bank.''

Under this evidence we think the federal aid may properly be considered in estimating the available revenue of the commission. Lawrence County v. Lawrence County Fiscal Court, 191 Ky. 45; Nelson County v. McCrocklin, 175 Ky. 199.

The same may be said of county donations where the money is in the hands of trustees, or when the donations have been legally made by solvent counties, and the proceeds are available under legal levies or bond issues, details which must be guarded as they arise.

It is next claimed that the tax on gasoline and the license tax on automobiles are uncertain, and the amount of revenue to be derived therefrom cannot be anticipated or approximated. We cannot concur in this. Automobiles have been in general use for many years, and the number in use show an annual increase. Indeed, they have become indispensable both for business and pleasure. From last year's report the number now in use can be ascertained with reasonable accuracy and there is nothing to indicate a falling off during the biennial period. The act requires a license to be taken out on all that are so used, and judging the future by the past, it is reasonable to anticipate the number will increase rather than diminish, and as the use of gasoline is largely incidental to that of motors, the same may be said of it.

In Overall v. City of Madisonville, 125 Ky. 694, it was held that anticipated fines and occupational license fees are too indefinite and uncertain to be considered in estimating future revenues. This is certainly correct as to fines, and it may be difficult to determine in advance how many persons will pay an occupation tax, but, as pointed out above, the use of automobiles has become stabilized, and a tax for the privilege of using them upon the public highway is standardized and the two cases are not analogous. We conclude that such taxes may properly be considered in estimating the revenues of the board.

Taxes are levied and appropriated to this special fund under the budget bill enacted by the General Assembly. We do not think this budget affected by the outstanding state warrants heretofore issued for governmetal expense. If they were authorized and legal they were appropriations which cannot be charged as an in-

debtedness against this fund. If illegal they certainly cannot be charged against it.

Wherefore judgment is reversed and cause remanded for proceedings consistent with this opinion.

Whole court sitting.

Chief Justice Sampson dissenting.