## LULING OIL & GAS CO. v. EDWARDS.
### No. 7482.

Court of Civil Appeals of Texas. Austin.
Oct. 27, 1930.

Motions for Rehearing Overruled Nov. 26, 1930.

T. C. Johnson, Jr., of San Marcos, for appellant.

R. E. McKie and George W. Edwards, both of San Marcos, for appellee.

McCLENDON, C. J.

Suit by Edwards against Luling Oil & Gas Company for damages for breach of a contract under which Edwards leased a drilling

rig to the oil company. The judgment was for Edwards upon a special issue verdict, and the oil company has appealed.

The items of damage sued for were: (1) $625, rental, being $125 balance July and $500 all of August, 1928; (2) $140, cost of removing the rig from the leased premises; (3) $15, cost of completing dismantling the rig; and (4) $3,264, the value of various parts of the rig (24 articles in all) which were either lost or broken so as to be unfit for use. The judgment included the full amount of the first three items above, but no issue with regard to them was submitted to the jury. The issues submitted related only to the fourth item. The propositions presented question the propriety of the judgment as to each of the first three items, and urge certain objections to the charge.

The rig in question had been leased by Edwards to the oil company under verbal agreement to drill well No. 1 on the Carter lease. After abandonment of that well the lease in question was executed. It reads:

"1. First party is the owner of one rotary drilling rig, which is now located on lease belonging to second party. First party here rents and leases unto second party the said complete drilling rig for the making of another well on the property of second party, said new location to be known as Carter No. 2.

"2. It is expressly understood that second party will at its own expense remove the said rig from its present location to the new location, and will at its own expense make all repairs and replacements to such rig as may be necessary to put it in proper condition for use, and second party further agrees and binds itself to pay to first party at San Marcos in Hays County, Texas; the sum of Five Hundred Dollars ($500.00) per month for the use of said rig.

"It is expressly understood that the term of this lease shall begin May 1st, 1928, and said rent shall be paid in advance, the first payment being made May 1st, 1928, due each month thereafter as long as said rig remains on said location or in possession of second party. It is expressly understood that upon the completion of said well, or its abandonment by second party, second party agrees to tear down rig and have it in a movable condition before releasing same to party of the first part.

"3. Said second party agrees to keep said rig in repair, and at the expiration of this lease, to deliver same to first party in as good condition as same was when received by second party, reasonable wear and tear from ordinary usage excepted.

"4. It is expressly understood that failure to pay the rental provided for herein, when and as same becomes due, under the terms hereof, shall at the option of first party at once terminate this contract, and in such event first party shall have the right to enter upon the property of second party, retake possession of said rig, and remove same from said location, in which event, however, second party will be liable for all unpaid rentals, including rental for the current month, and shall also be liable for the expense of moving said rig, provided same is removed to a location as hereinabove mentioned and specified, or to the town of Luling."

Special issues submitted to the jury follow:

"2. At the time defendant finally completed the redelivery of plaintiff's drilling rig to him, were any of the parts or appliances belonging thereto, necessary for use with same and mentioned in plaintiff's first amended original petition, missing or broken so as to be unfit for use? You will answer 'yes' or 'no.'

"3. If you have answered special issue No. 2 'no,' you need not answer the following question; but if you have answered same 'yes,' then, bearing in mind the following instructions, you will answer the following question:

"'Market Value,' as that term is used in the question submitted to you, means the general or ordinary price for which property of like kind and character may be bought and sold at the time and place under consideration in the usual and ordinary course of business.

"Bearing in mind the above definition of 'Market Value,' what was the fair and reasonable market value at the time and place said drill rig was redelivered to plaintiff, of such parts and appliances, if any, as were missing or broken so as to be unfit for use?

"In answering the above question, you will answer only as to the specific articles mentioned in Plaintiff's First Amended Petition and the value, if any, found by you cannot exceed the value as alleged in plaintiff's said pleading.

"In determining the value of any articles mentioned in plaintiff's said pleading, you will not allow any sum for depreciation or loss resulting from reasonable wear and tear from ordinary usage while defendant had possession of plaintiff's drill rig."

By seven propositions appellant raises, in substance, the following objections to the charge:

1. That no allowance is made in special issue 3 for depreciation due to ordinary wear and tear as provided in the contract (propositions 5 and 9).

2. That it was improper in special issue No. 2 to refer to plaintiff's petition for a list of the items in suit (proposition 2).

3. That each item constituted a separate ground of recovery and should have been submitted separately (propositions 1, 3, and 4).

4. That there was no pleading to recover items of replacement made by the oil company (proposition 10 presented as fundamental error).

We sustain the first of these objections. The contract expressly provides that the redelivery to appellee should be "in as good condition as same was when received by second party, reasonable wear and tear from ordinary use excepted." Appellee contends that this is what the court in fact stated in special issue No. 3. Very probably the court so intended, but we do not so construe the language used. The question there asked was the market value of such parts and appliances as were missing or broken so as to be unfit for use; and in giving their answer the jury were charged not to allow any sum for depreciation or loss resulting from reasonable wear and tear from ordinary use. The measure of appellee's recovery was the market value of such parts and appliances in the condition they should have been upon redelivery, taking into consideration depreciation resulting from reasonable wear and tear from ordinary use. The issue propounded does not call for a finding of value arrived at by this method, but, as we construe it, calls for full market value without taking into consideration such depreciation.

We hold the second objection well taken; although it is not necessary for us to determine whether it presents reversible error. Appellant's brief points out that several of the listed articles were eliminated by conclusive proof. Under that situation the inquiry should have been limited to those as to which the evidence would support recovery.

We do not sustain the third objection. In the contract the rig was treated as a unit, and recovery of the value of the several parts missing or broken so as to be unfit for use was sought under a single provision of the contract. Such several parts were no more independent grounds of recovery than would be the several items going to make up an open account.

The propriety of grouping such items in a single issue, however, does not turn upon whether the grouped items constitute a single ground of recovery. The term "issues," when applied to the requirement that all made by pleading and evidence be submitted, has relation to ultimate fact issues constituting the essential elements of recovery or defense. As applied to the case before us, and following the form used in the court's charge, those issues were: (1) Which, if any, of the articles were missing or broken, etc.; and (2) what was the reasonable value of such articles in the condition in which they should have been delivered under the contract, that is, after making proper deduction for reasonable wear and tear from ordinary use? Of necessity the jury would have to determine each of the two issues above as to each article, but it was not essential that their findings thereon should be itemized. Analogies arise in a variety of situations where recoverable damages embrace more than one item.

The general rule here involved is stated in Texas City Transportation Co. v. Winters (Tex. Com. App.) 222 S. W. 541.

A leading object of the special issue verdict method, as contrasted to that of the general charge, is to confine the jury to its proper function, that of a purely fact finding instrumentality. The answers of the jury, read in the light of the record, should be such as to enable the judge to render a proper judgment, as upon a found statement of facts. It should leave no fact issue to be determined by the judge; and either party, by following the prescribed methods (i. e. objections to the charge and requested special issues and charges), is entitled to have every controverted ultimate fact issue determined by the jury. Obviously, in the infinite variety of controversies incident to civil litigation many difficulties arise in determining (1) what are the ultimate fact issues, and (2) how best to frame them. The difficulties incident to these two problems inhere in the general charge as well as in the special issue method. The first problem lies at the very base of the litigation, and involves a proper legal analysis of the controversy. The second is obviously addressed largely to the discretion of the court, which should only be reviewed where prejudicial abuse is shown; the object being to so frame the issues as to direct the jury's attention, in as clear, simple, and direct a manner as possible, to the concrete fact questions they are called upon to decide. The grouping, vel non, of items constituting a single ultimate fact issue goes to the manner and form of submitting the special issues, and falls within the discretionary duties of the trial judge.

We are not prepared to say, however, that it would not have been better practice in attaining the above-desired object to have answers of the jury to issues 2 and 3 itemized, and we suggest the following forms:

Form of issues 2 and 3:

2. At the time defendant finally completed the delivery of plaintiff's drilling rig to him, were any of the parts or appliances belonging thereto, necessary for use with same and tabulated in the form of verdict submitted herewith, missing or broken so as to be unfit for use? You will answer "Yes" or "No" as to each of said items in the column provided in the accompanying form of verdict.

3. If you answer "Yes" as to any of said items in issue 2 above, then you will answer as to each of such items in the column provided therefor in the accompanying form of verdict the following question; as to such, if any,

of said items as you may answer "No" you will not answer the following question.

(Define market value.)

Bearing in mind the above definition of market value, what would have been the fair and reasonable market value of such parts or appliances, if any, as you may find were missing or broken so as to be unfit for use, at the time and place said rig was redelivered to plaintiff, had such parts or appliances been delivered to plaintiff in the condition they were in when received by defendant under the contract, less such depreciation, if any, as would have resulted from reasonable wear and tear from ordinary usage?

Form of verdict:

·Answers ·to issues 2 and 3:

| Items | Whether missing or broken so as to be unfit for use. | Market value less depreciation |
|-------|-------|-------|
| 1. (describing it) | ———— | $———— |
| 2. " " | ———— | $———— |
| 3. " " | ———— | $———— |

■■■■ The fourth objection arises out of the following facts: The contract provides that the oil company "will at its own expense make all repairs and replacements to such rig as may be necessary to put it in proper condition for use." Appellee pleaded that there was a verbal agreement at the time the contract was made to the effect that such replacements when made should become his property. There was a disputed issue of fact regarding such agreement, and it was submitted to the jury under special issue No. 1 and decided in favor of appellee. There were a number of objections to this issue, but since they are not brought forward in any proposition they will not be noted. The objection in question contends that the pleading only sought recovery for such items as were parts of the rig at the time it was delivered to appellant, and did not include items of replacement made by appellee which became the property of appellee under the verbal agreement. We do not give this construction to the pleading. The specific items, value of which was sought, are detailed, and it clearly appears from plaintiff's pleadings that replacements made by defendant became his property. Such allegation would be immaterial, except as it might relate to the items recovery for which was sought. We hold the pleading sufficient to cover any replacement items which might be included in plaintiff's tabulated list. Additionally, objections to the court's charge in order to be availed óf must be urged by seasonable objections, and therefore cannot be brought within the doctrine of fundamental error.

■■■■ Upon the item of $625 rental, it is contended that the trial court should have submitted to the jury the issue as to whether the contract was terminated in July, as contended for by appellee; and that since there was an issue of fact in that regard, the court could not properly render judgment for plaintiff without a jury finding thereon. Appellant's contention is correct, unless appellee as a matter of law is entitled to the $625. .The facts in that regard in substance follow: July 3, 1928, Edwards wrote the oil company to the effect that if it did not remit by the following night $250, rental from June 15th to July 1st, $125, one-fourth of July rent, and "$22.50 for the cathead you owe me for," "then the contract shall terminate and you shall become liable as stipulated in the contract." July 7, 1928, Smith (president of the Oil Company) replied, inclosing $250, adding, "will have some more in a few days."

July 19th Edwards wrote the oil company:

"I am of the opinion that I should receive your check for rent, as I think I have been lenient with you people since I have terminated the contract. I permitted you to go ahead and use the rig, when I could have shut you down. So I warn you to shoot square with me, and let me have your check by return mail."

August 4, 1928, Clem (secretary of the oil company) wrote Edwards:

"Enclosed you will find check of the Luling Oil & Gas Co. for $397.50, same being rental on rig for three weeks at $125.00 per week and $22.50 for one cathead.

"Mr. Smith has advised me to write you that the rig no doubt will be in use for another week, at which time we will settle with you for the remainder."

August 6, 1928, Edwards replied:

"Yours received together with check for the sum of $397.50. As you have utterly failed to comply with the terms of the contract, I hereby by virtue of and under the terms of the contract at once terminate said contract, and shall at once and now take possession of said rig and remove same at your expense, according to the terms of said contract, waiving no right as provided under the contract in my behalf."

Edwards testified that a few days later he made an effort to take possession of the rig. "I went down there to shut it down, but I did not shut it down and they continued to retain possession of it, I called Mr. Smith up at San Antonio, and asked him to give me permission to go out there and shut it down, and he said he would not; and I told him I would go out there and shut it down anyway; and he said that if I went out there and shut it down I would pay for it. They were using the rig at that time and continued to use it after that."

Smith testified that the rig was not used for ·drilling purposes during August, and:

"What we needed the rig for was that we had to deliver it to Mr. Edwards broken down,

926

and I had accumulated enough money to hire this man and break it down so that we could deliver it to him. He came down there and tried to stop us, and said he was going to get out an injunction to stop us. I said, 'Mr. Edwards, we are fulfilling our contract; we are breaking the rig down so you can move it.'"

He also testified with reference to Clem's letter of August 4th:

"When this check was sent, it was supposed to be the final payment, Clem, our secretary, wrote Mr. Edwards that I would settle with him for the remainder because he misunderstood me; he is a banker and did not understand it. Our secretary had no right to write that letter and put what he did in it; I did not word the letter."

August 14, 1928, the oil company wrote Edwards:

"This is to notify you that your rig on the Carter lease of ours in Caldwell County has been broken down and is ready for you to move it. We ask that you do so at the earliest possible moment as we have fulfilled our contract."

Smith testified that he did not give Edwards any notice at all that he could get the rig, except that contained in the letter of August 14th.

Edwards had the right to terminate the contract in July for nonpayment of rent; in which event, the contract reads, he should "have the right to enter upon the property of the second party, re-take possession of said rig, and remove same from said location, in which event, however, second party will be liable for all unpaid rentals including rental for the current month." The rental was to be at the rate of $500 per month in advance, "as long as said rig remains on said location or in possession of the second party." Regardless of the conflict between Edwards and Smith as to the use of the rig in August, and regardless of Edwards' efforts in July to terminate the contract, it is undisputed that the oil company retained possession of the rig under a claim of right to hold such possession until tender of delivery was made on August 14th. Had the oil company acquiesced in the attempted termination of the contract and tendered possession to Edwards in July, we would have a different question. It is immaterial that the refusal to surrender possession was due to the fact that the oil company recognized its obligation to dismantle the rig. The oil company could not refuse possession to Edwards under a claim of right under the contract and at the same time contend that the contract had been terminated. Its retention of possession for whatever purpose until August 14th estopped it from asserting that the lease had terminated prior to that time, and under the express terms of the lease it was liable for rentals as long as the rig remained in its possession and at the rate of $500 per month, payable in advance. The undisputed evidence, therefore, showed that the oil company was due Edwards $125, the balance of July rent, and $500, full amount of the August rental; and there was no fact issue in that regard to be submitted to the jury.

Upon the $140 item, it is urged that the amount was an issuable fact and the court could not therefore properly render judgment. Edwards testified that he paid $140 for removing the rig to a location very near the leased premises, and that it would have cost more to move it to Lockhart. He gave the name of the party to whom he paid the amount and introduced a receipted bill. No objection was made to the testimony and there was no other evidence upon the subject. Two points are urged upon this issue, namely: That the uncorroborated testimony of plaintiff, an interested witness, could not be taken as conclusive of the facts testified to by him; and that there was no showing that the amount paid by plaintiff was reasonable.

The rule that the uncorroborated testimony of interested witnesses, although not controverted, does not conclusively establish a fact, is not applicable where the nature of the testimony is such that it might readily be discredited, if it were not true, and the adverse party offers no disparaging proof whatever. There were no circumstances whatever in the record which would throw any doubt or suspicion upon the testimony of plaintiff that he actually paid to the party named $140. We therefore think the testimony presented no issuable fact in that regard.

The contract provided that the oil company should be liable for the "expense" of removing the rig. This language of itself made the oil company liable for whatever it cost Edwards to remove it; and Edwards met the express language of the contract when he proved what he had paid in this regard. If the amount was unreasonable, it was incumbent on the oil company to show that fact.

With reference to the $15 item, the evidence is conclusive that the oil company in dismantling the rig failed to take up the water line, a duty within the express obligation of the contract. Edwards testified that he paid $15 on this account. There was no evidence that the amount was reasonable. The same points are urged with reference to this item as those with reference to the $140 item. The first of these points is determined adversely to appellant, on the grounds stated above. We think, however, it was incumbent upon appellee to show that the amount paid was reasonable. Under the contract the oil company did not agree to pay the expense of tearing down the rig and having it in movable condition, as in the case of moving the rig. It bound itself to do the tearing down and putting in movable condition. It did not com-

plete its obligation in this regard and appellee had the work done. His measure of damage, the elements of which it was incumbent upon him to prove, was the reasonable cost of completing the obligation of appellant. He proved the cost but did not prove the reasonableness, and to that extent his evidence failed.

The judgment of the trial court upon the $625 and $140 items and interest thereon is affirmed. As to the $15 item and the item for the value of parts and appliances lost or broken so as to be unfit for use, the trial court's judgment is reversed, and the cause remanded for a new trial.

Affirmed in part, and in part reversed and remanded.