**FERGUSON et al. v. JOHNSON et al.**

No. 7933.

Court of Civil Appeals of Texas. Austin.

Feb. 2, 1933.

Rehearing Denied Feb. 4, 1933.

James E. Ferguson, of Austin, Judge Ocie Speer, and Judge Ike D. White, both of Austin, for appellants.

James V. Allred, Atty. Gen., and R. G. Waters, A. R. Stout, and Neal Powers, Asst. Attys. Gen., for appellees.

McCLENDON, Chief Justice.

Appeal from a final judgment, upon a directed verdict, denying appellants an injunction restraining appellee members and chief engineer of the state highway commission from making further road construction contracts, and appellee state comptroller from issuing warrants in payment thereof. The case was lately before us upon appeal from a temporary injunction. 55 S.W.(2d) 153.

The questions presented in the present appeal arise upon the following points urged by appellants:

1. Chapter 13, Gen. L., 3d Called Sess., 42d Leg. (H. B. No. 2, p. 15), repealed that portion of the appropriation providing for future road construction by the commission. Chapter 286, Gen. Laws, Reg. Sess. 42d Leg. This was one of the two controlling propositions urged and had our mature consideration upon the former appeal. No grounds additional to those then advanced are now presented,

374

and further elaboration of our views in overruling the contention would serve no practical end.

2. Under the enabling statutes, the commission's power to contract for highway construction is limited to the amount of funds actually deposited in the treasury to the credit of the highway fund, and cannot be extended to anticipated revenues coming into that fund during the fiscal year from gasoline tax or any other source.

3. Federal aid appropriations, being mere gratuities on the part of the national government, cannot be included in estimating "funds available" for highway construction until actually deposited in the state treasury.

4. In any event, it was a jury question whether the commission had adopted a reasonable basis of estimating the amount coming into the treasury to the credit of the highway fund during the remainder of the fiscal year ending August 31, 1933.

Based upon records of the highway, comptroller's, and treasury departments, and estimates of probable revenues and expenditures, the resources and liabilities of the highway department for the fiscal year ending August 31, 1933, were on October 31, 1932, as follows (the several items are actual or estimated as indicated in the statement):

Statement of Estimated Resources and Expenditures of the State Highway Fund

For the Period from November 1, 1932, to August 31, 1933, Including Only Highway Construction Contracts Outstanding At October 31, 1932.

*Resources.*

State Highway Fund:

| | | |
|---|---|---|
| Balance, October 31, 1932, per state treasurer's records *actual* | | $ 9,201,944.72 |
| Reimbursements receivable —Due at Oct. 31, 1932, for expenditures on construction made prior to October 31, 1932: | | |
| Due from federal government *actual* | $ 1,447,886.69 | |
| Due from counties *actual* | 680,750.44 | |
| Due from others *actual* | 26,504.44 | |
| Total reimbursements receivable *actual* | | 2,155,141.57 |
| Estimated revenue: | | |
| Gasoline tax | $10,200,000.00 | |
| Auto license fees | 3,875,000.00 | |
| Interest on state highway fund | 143,750.00 | |
| Miscellaneous | 30,000.00 | |
| Aid on maintenance | 197,703.46 | |
| Total estimated revenue *estimated* | | 14,446,453.46 |
| Aid available on construction contracts outstanding at October 31, 1932: | | |
| From federal government | $ 8,512,017.36 | |
| From counties | 320,772.20 | |
| From others | 42,465.00 | |
| Total aid available on construction contracts outstanding at Oct. 31, 1932 *actual* | | 8,875,254.56 |
| Total resources | | $34,678,794.31 |

*Expenditures.*

Estimated expenditures other than for construction:

| | | |
|---|---|---|
| Maintenance of highways | $ 8,204,716.88 | *Estimated* |
| Appropriation for general administration, license plates, office supplies, and expenses | 519,184.26 | " |
| State highway patrol | 304,635.22 | " |
| Material and test laboratory and miscellaneous | 181,908.79 | " |
| Purchase of equipment | 275,000.00 | " |
| Cost to complete highway department office building | 361,632.39 | *Actual* |
| Total estimated expenditures other than for construction | 9,847,077.54 | |
| Highway construction cost: | | |
| Construction contracts outstanding at October 31, 1932 | 20,160,979.04 | *Actual* |
| Total estimated expenditures | 30,008,056.58 | |
| Resources not obligated at Oct. 31, 1932 | 4,670,737.73 | |

*Federal aid available—Not under contract at October 31, 1932.*

| | | |
|---|---|---|
| Emergency federal aid—To be obtained, it must be put under contract and work completed by June 30, 1933 | 3,902,151.00 | *Actual* |
| Regular federal aid | 1,315,567.04 | |
| Total federal aid available—Not under contract at October 31, 1932 *actual* | | 5,217,718.04 |
| Total of resources not obligated at October 31, 1932, and of federal aid available not under contract at October 31, 1932 | | $ 9,888,455.77 |

This statement was compiled by the state auditor. The "actual" items were taken from records of one or more of the above departments; those "estimated" under the heading "Resources" are calculations from actual record figures of the previous two-year period with deductions of 12 per cent. based upon trend and other probable factors. The highway department's estimates allow 6 per cent. decrease. While the "estimated" state revenues cover the ten months' period (November 1932 to August 1933), the November 1932 receipts had been paid into the treasury at the time of trial, and showed an increase over estimate of $32,000. This item, therefore, is "estimated" only for the remaining nine months' period (December 1932 to August 1933). The statement shows a net surplus of $4,670,737.73 (exclusive of federal aid not contracted against), which is approximately 24 per cent. of the total (actual and estimated) expenditures of the department, less the treasury balance, and 32 per cent. of such expenditures less treasury balance plus actual (not estimated) available resources. The contracts sought to be enjoined amount to $4,183,245.37, of which $986,814.20 is to be paid out of "regular" and $2,670,804.43 out of "emergency"

available federal aid fund of $5,217,718.04 not otherwise contracted against. The remaining $525,626.74 is to be paid out of state funds. If this latter be deducted from the $4,670,737.73, the surplus percentage would be reduced a shade over 2 per cent. In other words, after these contracts are let, there will still be a surplus of resources over liabilities (actual and estimated) amounting to approximately 30 per cent. of the total "estimated" items of revenue.

■ Appellants' second point is predicated primarily upon that portion of Vernon's Ann. Civ. St. art. 6674*l*, which inhibits the commission from entering into any contract "which will create a liability on the part of the State in excess of funds available for expenditure under the terms of this Act." The point made is that "funds available" means only funds actually deposited in the treasury to the credit of the state highway fund. Other statutory provisions cited as bearing upon the question are: "Art. 6674d [6674q—4]. All further improvement of said State Highway System with Federal aid shall be made under the exclusive and direct control of the State Highway Department and with appropriations made by the Legislature out of the State Highway Fund." And: "Art. 6674e [6674q—5]. All moneys now or hereafter deposited in the State Treasury to credit of the 'State Highway Fund', including all Federal aid moneys deposited to the credit of said fund under the terms of the Federal Highway Act * * * shall be subject to appropriation [by the legislature] for the specific purpose of the improvement of said system of State Highways by the State Highway Department."

"Funds available," as marking the bounds of the commission's contractual liability creating authority for "highway improvement" (article 6674*l*, above), can, we think, mean but one thing, namely, funds made available for that purpose by the Legislature through appropriation. The appropriation covering the biennium ending August 31, 1933, is set forth on pages 706–712, Gen. Laws Reg. Sess. 42d Leg. (1931); all of the items of which are expressly required to be paid "out of the State Highway Fund." The first five pages list specific items for each of the fiscal years 1931–1932 and 1932–1933, aggregating $579,-370 and $584,870, respectively. Additionally there is a lump-sum appropriation of $500,000 for the highway building and various other items, some of which are for definite amounts, others general. The item of appropriation here in question reads: "All funds coming into the State Highway funds on hand September 1, 1931, and all funds coming into the State Highway funds, and derived from registration fees or from other sources, after deducting the specific appropriations herein made, are hereby appropriated to the State Highway Department for the establishment of a system of state highways and the con-

struction and maintenance thereof, as contemplated and set forth in Chapter No. 190, Acts of 1917, and all Acts or Amendments thereto." (Acts 1931, c. 286, p. 711.)

"Funds derived from registration fees, and other sources," clearly embraces every species of pecuniary resource allocated to the highway fund; and "coming into the State Highway Fund" manifestly applies to the future and embraces the entire biennium ending August 31, 1933. "Funds," while a broader term than "money," which it includes, has no absolutely fixed definition, but includes a variety of meanings according to the context. As used in article 6674*l*, it means all resources allocated to the highway fund, and the modification "available" means made available (that is made capable of being used; given potentiality for use) by legislative appropriation.

As supporting their contention, appellants rely upon Harlingen I. S. Dist. v. C. H. Page & Bro., 48 S.W.(2d) 983 (an unadopted opinion of the Commission of Appeals), and Rice v. Milwaukee, 100 Wis. 516, 76 N. W. 341, 342.

In the former it was held that the proceeds of bonds which had not yet been authorized by vote of the electorate, although the election for that purpose had been called, were not "available funds" to be contracted against —a manifestly inescapable conclusion. Bone v. Black, 174 S. W. 971, 973 (by the Amarillo Court of Civil Appeals) is quoted from with apparent approval. The holding there was that proceeds of such bonds were not "available funds" for contractual purposes, until the bonds had been sold. This holding is predicated upon the following: "Article 2842 indicates that until the bonds are sold the taxes levied to pay them may be discontinued by vote. If before they are sold the tax should be discontinued, the bond will be valueless. Hence a contract before they are sold does not bind the fund."

The fact situations in the Harlingen and Bone Cases present no analogy which would make the decisions there controlling here. There the contracting agency acquired no control over the fund to be derived from the bonds until they were sold. The situation here is entirely different. The funds have been made "available" to the contracting agency (the highway commission) by the authorized body (the Legislature) through appropriation.

■ There is an essential difference between "funds available" when applied to proceeds of a bond issue voted for a specific purpose, and "funds available" when applied to current revenues allocated to the support of a governmental department engaged continuously in the improvement and maintenance of an entire "correlated" system of state highways. The language of those opinions must be construed with reference to the is-

sues for decision. The authority of a judicial *opinion* is limited to the judicial *decision*. It is what the court *decides* and not what the court *says* in so deciding which gives authority to the opinion. It is not a safe practice (but often an unfair one to the author) to isolate general expressions of view, and attempt to give to their apparent meaning in the abstract, a universal application.

■ Appellants argue that the Legislature has the continuing power to repeal the appropriation or allocate the fund to other uses. This power is conceded, but it does not militate against the availability of the appropriated fund so long as the power is not exercised. Furthermore, this power is not limited to that portion of the fund which has not yet been actually deposited in the treasury, but exists in like manner and to a like extent over that portion of the fund which has been actually deposited in the treasury. We are not here concerned with the effect or validity of a legislative repeal of an appropriation after it has been contracted against. The impotence of private individuals to enforce through the courts their contractual rights against the state, by reason of inability to sue the state without its consent, inheres in every such contract. This impotence, however, does not affect the binding force of state obligations; nor does it deprive the Legislature of the power to delegate to an appropriate agency authority to create binding contractual obligations against the state. It is not to be presumed that the Legislature will withdraw appropriations already contracted against under its own direction (conceding its power to do so), without making adequate provision to meet the valid obligations its authorized agency has created at its behest. To do so would amount to repudiation. But even should the Legislature see fit to repudiate valid state obligations, its act in so doing would not have the retroactive effect of destroying the previously exercised contractual power of its agency. If such act of withdrawal rendered unavailable the previously available fund, the excess of liability over available fund would not be created by the highway commission but by the Legislature; which body by such act would be creating a liability which it has expressly denied to its constituted agency the power to create. If it should be held that this continuing power of withdrawal is a limitation upon the contractual power of the commission, then, as above shown, it extends to funds in the treasury as well as to those coming into the treasury. From which it would follow that the entire contractual power attempted to be conferred would be a nullity and the commission would be impotent to perform the functions for which it was created.

In the Wisconsin case a bond issue of Milwaukee was sought to be enjoined on the ground that when added to existing city indebtedness it "was in excess of the constitutional limit of 5 per cent. of the assessed valuation of the city." It was held that in estimating the net outstanding city indebtedness, prospective "available" city revenues were proper deductions from the gross indebtedness; but that estimated revenues from liquor licenses could not be included in "available" prospective revenues. This for the asserted reason that: "The moneys to be derived from these sources are entirely indefinite and uncertain. They were not in the process of collection, and could be collected only at the will of parties who sought privileges for which license charges were made, and for that reason could not be considered as available assets or resources."

In *Premier Const. Co. v. Kimmell*, 230 Ky. 439, 20 S.W.(2d) 77, 81 (1929), the Court of Appeals of Kentucky reached the opposite conclusion in a virtually all fours case. It held: "Now the principle underlying this Billeter & Wiley Case [203 Ky. 15, 261 S. W. 855] is plainly that, if a license or occupational tax is levied upon the use of a thing or occupations which have become over a period of years stabilized and where, judging the future by the past, it is reasonable to anticipate that the number will probably increase or at least not appreciably decrease, such tax may properly be considered in estimating the revenues. It is entirely proper that it should be so considered. Those who have to deal with governmental affairs, or who have made any study of them, know that experience has demonstrated that a sure and stabilized source of income are the license and occupational taxes."

The following is from the cited Billeter Case: "It is next claimed that the tax on gasoline and the license tax on automobiles are uncertain, and that the amount of revenue to be derived therefrom cannot be anticipated or approximated. We cannot concur in this. Automobiles have been in general use for many years, and the number in use shows an annual increase. Indeed, they have become indispensable, both for business and pleasure. From last year's report the number now in use can be ascertained with reasonable accuracy, and there is nothing to indicate a falling off during the biennial period. The act requires a license to be taken out on all that are so used, and, judging the future by the past, it is reasonable to anticipate the number will increase rather than diminish, and, as the use of gasoline is largely incidental to that of motors, the same may be said of it." 203 Ky. 15, 261 S. W. 855, 861.

■ Stability as a factor in estimating future revenues from whatever source is only a relative term. The downward trend in gasoline tax receipts, estimated at 6 per cent. by the commission and 12 per cent. by the state auditor, is not peculiar to this tax. The

situation producing this trend operates also upon every other source of revenue. However, the relative stability of the gasoline tax as contrasted with the ad valorem tax on real estate (cited by appellants and universally regarded as possessing in the highest degree the certainty requisite to "availability" for contractual and debt creating purposes) tends to increase as economic conditions recede below the normal. The underlying causes do not concern us here; but the fact is apparent from mounting deficits in receipts below previously estimated ad valorem revenue sources. Reasonable prudence in the administration of governmental fiscal affairs would require that probable contingencies be provided against. A sudden crisis, a disaster of cataclysmic proportions, even a complete debacle, is always within the realm of possibility. But to guard against such possible contingencies would virtually put an end to all governmental functioning. We are unable to grasp the force of appellants' contention that prospective revenues from the gasoline tax and motor license fees cannot be classed as "available" by reason of their uncertainty or instability.

█ If the meaning appellants ascribe to the legislative pronouncements under consideration were so plain as not to admit of doubt or question, the general rule of statutory construction usually applied in such case would not permit us to look beyond the language employed to discover the legislative intent. But even this rule is not an altogether inflexible one; and where the literal, grammatical, or dictionary interpretation of the language would defeat or substantially impair effectuation of the legislative objective, the wording in which the Legislature has clothed its mandate will not be given controlling effect. Many illustrations might be cited. A comparatively recent one is found in Lottman v. Cuilla (Tex. Com. App.) 288 S. W. 123, later approved in Gattegno v. The Parisian (Tex. Com. App.) 53 S.W.(2d) 1005, wherein it was held that the common-law doctrine of noncontribution among joint tortfeasors was abrogated in its entirety, although the abrogating act expressly limited its application to cases in judgment. The presumed legislative purpose was held to control, as against the words employed to give expression to that purpose. Even did we concur in appellants' view of the literal meaning of the statutory language here involved, we might with propriety paraphrase from an opinion of the Supreme Court of the United States: "The purpose of the statute to develop and maintain an adequate" highway "system for the people of" Texas "requires a broader and more liberal interpretation than that to be drawn from mere dictionary definitions of the words employed by" the Legislature. Piedmont & N. O. R. Co. v. In-

terstate Commerce Com., 286 U. S. 299, 52 S. Ct. 541, 76 L. Ed. 1115, at page 1123.

█ But the language we are now considering, if in fact susceptible of appellants' construction, is not so plainly, unambiguously, and unequivocally so, as to preclude inquiry into the legislative purpose, or resort to canons of construction.

█ While we do not sustain appellees' contention that, under the theory of the case doctrine, appellants are estopped from urging a statutory construction contrary to that upon which the suit was pleaded in the lower court, such prior construction is we think highly persuasive in the instant case. The original petition, upon which the temporary injunction was obtained, manifests meticulous care in its drawing, and bears the signature of counsel distinguished for legal ability at the bar, upon the civil appellate bench, and as a writer of standard legal texts. This petition, and the amended one upon which the case was tried, set out expressly and explicitly the grounds upon which appellants contend that the proposed contracts are illegal and in excess of the commission's powers. Nowhere in these pleadings is there intimation that "available funds" does not include prospective gasoline tax and registration fees for the remaining period of the current fiscal year. On the contrary, we read from the verified original petition:

"For the purpose of being as specific as possible, this plaintiff would show that the *funds available* to the Commission for all purposes *under the law, for the fiscal year, ending August 31, 1933,* are approximately as follows:

"*Estimated receipts* from all state sources upon the basis of actual receipts for previous years to August 31, 1933, $21,126,000.00.

"Federal Aid Available, $1,300,000.00.

"Amount cash in State Treasury, $8,123,-432.35.

"Total *Available Funds* for fiscal year, ending August 31, 1933, $30,549,432.35.

"The foregoing *estimate* of *available funds* is predicated upon the comparative value of previous receipts as a basis for estimate and the same is *believed* and *alleged* to be a *just, fair,* and *reasonable statement* of the *available funds* in *controversy*.

"As against said above *estimated* total of *available contract funds* for the fiscal year, ending August 31, 1933, plaintiff would show that there should be charged and held against the same," etc. (Italics ours.)

Appellants' present contention appears to have been first urged after the introduction of evidence in the trial court. If the meaning of the statutes was so plainly and unequivocally to the effect now claimed, the probability of its failure of earlier discovery by

appellants' able counsel is remote. If the contention now urged has substantial merit, its outstanding importance as sustaining the temporary injunction is manifest, and to withhold it until the trial on the merits would have been purposeless. Appellants now insist that we accept as ineluctable a construction which has all the earmarks of an afterthought on their part.

That "funds available" for contractual purposes embraces prospective revenues from all state sources during the fiscal year, as well as available federal aid, has been the uniform departmental construction from the beginning. It is not necessary to cite authority upon the proposition that such construction is given great weight by the courts, where the language of the statute does not plainly exclude it. A recent extensive case note upon the subject will be found in U. S. v. Missouri Pacific R. Co., 278 U. S. 269, 49 S. Ct. 133, 73 L. Ed. 322, at page 325, et seq., where the general rule is thus stated: "The practical interpretation of an ambiguous or uncertain statute by the executive department charged with its administration or enforcement is entitled to the highest respect, and, though not controlling, if acted upon for a number of years, will not be disturbed except for very cogent and persuasive reasons."

That this doctrine is peculiarly applicable to statutes affecting the fiscal affairs of the state was held in Franklin Fire Ins. Co. v. Hall, 112 Tex. 332, 247 S. W. 822, 823 (Mr. Chief Justice Cureton writing), from the opinion in which we quote: "The acquiescence of the Legislature in the departmental construction has not been merely a passive one, for the reason that the fees authorized by the act are a source of revenue, the consideration of which is one of the primary duties of the Legislature."

This departmental construction likewise accords with general practice in vogue in this and other jurisdictions. All general legislative appropriations for the support of the state government and its various departments and activities are made for a future biennium, the revenues to meet which are prospective and possess an element of uncertainty equally as great as that incident to those we are considering. We know of no instance in which the accumulation of such revenues in the treasury is a prerequisite to incurring governmental liability. The Legislature itself creates such liability in advance of covering treasury receipts in cases of specific appropriations, and authorizes creation of such liability by its contracting agencies.

Appellants urged both in the brief and argument that the intention of the Legislature that the highway department be conducted upon a cash basis is manifest from the fact that ample means to that end are provided in treasury receipts amounting to some two million dollars per month. This is an assumption without basis for its support. The amount of monthly revenues coming into the treasury can be regarded as large or small only as it relates to the purpose to which it is devoted. The limitations which this assumption would impose upon the department would seriously hamper, if not entirely preclude, efficient and economic execution of its imposed duties on a scale commensurate with the magnitude of construction and operation essential to a "highway system" for this state.

The maintenance and construction of state highways is not only authorized but enjoined as a duty of the highway department. Article 6674q—4 provides:

"All further improvement of said State Highway System shall be made under the exclusive and direct control of the State Highway Department and with appropriations made by the Legislature out of the State Highway Fund. * * * In the development of the System of State Highways and the maintenance thereof, the State Highway Commission *shall*, from funds available to the State Highway Department, *provide:*

"(a) For the *efficient* maintenance of all highways comprising the State System. ·

"(b) For the construction, in cooperation with the Federal Government *to the extent of Federal Aid to the State*, of highways of durable type of the *greatest public necessity*.

"(c) For the construction of highways, *perfecting* and *extending* a *correlated system of State Highways*, independently from State Funds."

As already noted, the appropriation for maintenance and construction is of the balance of the funds coming into the treasury "after deducting the specific appropriations herein made." The latter cover the entire period of each of the two fiscal years, and are in very large measure payable monthly. If we take each fiscal year as a separate unit (which is more favorable to appellants than including in a single unit the entire biennium), it would be necessary for the commission to defer all contracts for construction and maintenance until after there had accumulated in the treasury a sum sufficient to cover the entire specific appropriations for the fiscal year, plus the sum to be contracted against. It is readily apparent that this would seriously hamper the department in carrying out the legislative mandate, and inevitably result in substantial detriment to the state. Federal aid presents another serious complication. If this item cannot be contracted against until paid into the treasury, it would be necessary to accumulate an additional sum equal to the entire available federal aid fund before that fund could be contracted against. The available federal aid already appropriated by Congress and allocated to this state is $5,217,718.04. The department must complete construction con-

tracted against this fund prior to the end of the federal fiscal year (June 30, 1933), otherwise the appropriation lapses. It is hardly probable that any substantial portion of this appropriation can be salvaged, if contracts against it have to be delayed until funds equal to the appropriation have accumulated in the treasury over and above a sum sufficient to meet the department's outstanding obligations. And this, although the surplus of conservatively estimated resources over liabilities (actual and estimated), equals about 30 per cent. of the estimated resources. It is hardly necessary to further elaborate upon the deleterious consequences which would inevitably flow from confining the contracting powers of the department within the narrow limitations for which appellants contend. The record conclusively shows that the department has incurred these liabilities in pursuance of a uniform practice, and without any previous question having been raised as to their legality or propriety, and without any apprehension that it might thereby impair its ability to employ in the interest of the state the full amount of appropriated federal aid.

Furthermore, the record shows that no part of the estimated $8,204,716.88 requisite maintenance for the balance of the fiscal year has been contracted. If appellants' position is sound, the department is precluded from contracting for further maintenance until the treasury balance is sufficient to cover all unexpended specific appropriations and outstanding liabilities, plus the amount to be contracted for such maintenance.

The departmental construction evidenced by the uniform practice of contracting against anticipated revenues stands unchallenged in the record. It relates to disbursement of the largest fund allocated to any state department—a matter of the widest public interest which addresses itself peculiarly to legislative and executive scrutiny. The rules of each House of the Legislature provide for a standing committee on "State Highways and Motor Traffic." A departmental practice so vital to its functioning must necessarily from its inception have had legislative cognizance and therefore implied affirmative legislative sanction. Allocation to the "County Road District Highway Fund" of one-third of the department's prospective gasoline tax revenues necessitated minute inquiry into the status of the department's fiscal affairs, and its ability to carry on for the then (September 17, 1932) remainder of the current fiscal year, and presupposes an intimate knowledge of the practices of the department as they related to the very matter now in controversy.

Federal aid appropriations cannot be classified as mere "gratuities" in any proper sense of that word. One of the original expressly conferred powers of the Congress is "to establish * * * post roads." U. S. Const. art. 1, § 8, cl. 7. The acts under which federal aid is appropriated merely prescribe the method which the Congress has adopted for performing this important delegated function. The fact that the dual sovereignties operate within the same territory gives to each an interest in and consequent power of control over the same instrumentality—the public highways. Co-operation in the construction of such highways is not only permissible, but manifestly highly desirable. The particular method by which such co-operation is attained is a mere matter of detail. The Texas highway commission statutes are expressly designed to conform to the requirements of the federal aid acts. The procedure prescribed under the latter require designation of federal highways, and approval of projects and the performance of contracts thereunder, by federal agencies and officials. Payments are made as the work progresses upon estimates approved by federal engineers, as in other classes of large construction. The fact that these appropriations are deposited in the state treasury, and contractors paid by warrants drawn against the state highway fund to which they are allocated, is but a detail of administration (adopted no doubt for convenience in a joint enterprise), which does not affect the character or substance of the transaction. To the extent of federal aid funds the state highway department is in practical effect made the disbursing agency of the federal government. Contracts against these appropriations, though made in the name of the state, must have the approval of the federal authorities before they become binding obligations of the state, and in like manner federal approval of their performance is had before state warrants are issued to the contractors. These appropriations (of revenues derived from federal taxation) are no more gratuities than any other authorized federal appropriation, and when allocated to a particular state are as "available" as any other "fund" for appropriate contractual purposes. This is the unquestioned intent and purpose of the state and federal statutes upon the subject, and accords with the uniform departmental construction given to these statutes.

Appellants' fourth point, that the evidence presented a fact question for jury determination, is wholly without merit. The burden rested upon appellants to establish, prima facie, contemplated acts on the part of the commission in excess of their delegated powers. This burden was not met. No evidence was offered by appellants tending to show the amount of the "available fund" for contractual purposes other than the treasury balance on October 31, 1932. Without questioning the propriety of according to the individual taxpayer in a proper case the power to restrain the functioning of a governmental department, it would be a novel doctrine that

would require the department to make an affirmative showing justifying its acts whenever a taxpayer might feel disposed to interfere through resort to the courts. Such doctrine would be a denial of the generally recognized prima facie presumption of the honesty, integrity, and efficiency of public officials in performing the duties imposed upon them by law and by the obligations of their official oaths.

But even if such burden rested upon the department, it was met in the instant case by conclusive proof of the validity of its proposed acts in question. All of the facts bearing upon the issues presented are taken from public records of unassailed verity. The only discretionary power of the commission which is brought in question, has relation to the estimates of those prospective revenues which possess an element of uncertainty. As held in our former opinion, the commission's discretion in this regard is not subject to review except for palpable abuse. As already shown, a 30 per cent. margin of safety surplus, in addition to the auditor's allowed deduction of 12 per cent. exists in these funds, after they have been charged with all legislative appropriations and obligations of the department including those sought to be enjoined. This margin of safety is further increased by the commission's discretionary power of control over the amount of uncontracted future maintenance (estimated in the above statement at $8,204,716.88), which power may be exercised when necessary to meet any appreciable falling off of the monthly estimated treasury receipts. Under no reasonable standard of prudence could the proposed acts of the commission be classed as arbitrary or unreasonable. To hold that the propriety of this action is a fact issue would in effect be the substitution of a jury's judgment for that of the commission, and transfer to the courts the administrative functions reposed in the commission. The invoked doctrine that the uncontradicted testimony of interested witnesses is not conclusive has no application here. That doctrine has its limitations [Luling Oil & Gas Co. v. Edwards (Tex. Civ. App.) 32 S.W.(2d) 921], but their discussion would serve no useful purpose.

The trial court's judgment is affirmed.

Affirmed.

### On Appellants' Motion for Rehearing.

It is urged that we were in error in considering for any purpose the quoted allegations of the original petition, for the reasons (a) that this pleading had been superseded by the amendment, and (b) that it is not embodied in the present record and not now before us "for any purpose whatsoever." The quotation alluded to is copied in our opinion in the former appeal [55 S.W.(2d) 153, 155], which is a permanent record of this court. However, the quotation was not employed in any sense as a matter of record which would have binding effect upon appellants' rights or contentions. It was merely alluded to as lending additional force to the view that the statutory construction for which appellants now contend was not so conclusive as to admit of no substantial doubt, thereby excluding inquiry into the legislative purpose and resort to canons of construction. Our conclusions would be no different had appellants contended originally as they do now, although the added force of their original position would, in that event, be wanting.

The motion is overruled.

Overruled.