

# THE ATTORNEY GENERAL
## OF TEXAS

April 1, 1987

JIM MATTOX
ATTORNEY GENERAL

Honorable Bob Bullock
Comptroller of Public Accounts
L.B.J. State Office Building
Austin, Texas   78774

Opinion No. JM-666

Re: Whether the Comptroller may certify an appropriations bill for the next biennium if a deficit will exist at the end of the current biennium, and related questions

Dear Mr. Bullock:

The body of your March 10, 1987, letter requesting an opinion of this office is reproduced here in its entirety:

> For the first time since article III, sec. 49a, Tex. Const. was passed in 1943, Texas has borrowed money through cash management notes. When the notes are paid off on August 31, 1987, it is estimated the state will be a billion dollars in the red.

> The Constitution intends Texas to operate on a 'pay as you go' basis. Art. III, sec. 49 prohibits the state from creating debt. If no action is taken by the Legislature to correct the current situation, there will be a conflict with this provision in this biennium. If the funds borrowed from other accounts to pay off the cash management notes are not replenished by August 31, 1987, the state will enter the new biennium in the red.

> It appears to me the very purpose for the inclusion of sec. 49a becomes meaningless if this deficit is carried into the upcoming biennium.

> Therefore, I hereby request your official opinion on the following question:

> May the Comptroller certify any Appropriation Bill under Art. III, sec. 49a, Tex. Const. for the 1988-89 biennium if the Comptroller estimates and/or certifies that a deficit will exist at 12:00 midnight, August 31, 1987, and that sufficient revenues will not be available

> to retire that deficit prior to September 1,
> 1987?
>
> Because of the importance of this question, I will
> appreciate it if you will expedite your opinion.
> If you desire, I and my staff will be available to
> consult with you on this question at any time.

In order to properly address your question, it is first necessary
to establish the relationship between sections 49 and 49a of article
III, of the Texas Constitution, and to delineate the relative powers
of the Comptroller of Public Accounts and the Texas Legislature as
they are affected by section 49a.

Section 49 of article III has been a part of the Texas Constitu-
tion since its adoption in 1876 and has never been amended.  It reads:

> Sec. 49.  <u>No debt shall be created by or on
> behalf of the State, except to supply casual
> deficiencies of revenue</u>, repel invasion, suppress
> insurrection, defend the State in war, or pay
> existing debt; <u>and the debt created to supply
> deficiencies in the revenue, shall never exceed in
> the aggregate at any one time two hundred thousand
> dollars</u>.  (Emphasis added).

The term "casual deficiencies" is not defined by section 49, but
its meaning has never been unclear.  The terms "debt," "deficiencies,"
and "casual" as used in article III, section 49 were discussed by
Attorney General Gerald Mann in Attorney General Opinion O-2118
(1940).  The opinion, written for the Attorney General by then-
Assistant Attorney General Ocie Speer in the year before the section
49a amendment was proposed by the legislature, declared, in pertinent
part:

> 'Debt' signifies the pecuniary obligation of
> one who voluntarily assumes a liability, or upon
> whom the law imposes a liability.  In case, as
> here, the State is sought to be charged as a
> debtor, such debt may only be created through some
> agency lawfully authorized to bind the State.
>
> 'Deficiencies,' as the word is here used,
> pertains expressly to 'the revenue.'  A deficiency
> is a shortage or inadequacy in a sum or fund, and
> the revenue contemplated is that portion of the
> public moneys appropriated by the Legislature to
> the particular purpose as to which there is
> claimed to be a deficiency.

> 'Casual deficiencies,' in this connection, means an unforeseen and unexpected deficiency -- an insufficiency or lack of funds to meet a situation which unexpectedly develops and requires the immediate attention at a time when the Legislature, the usual authority, is unable to act. Lewis v. Losley, 19 S.E. 57; 92 Ga. 804; In re [A]ppropriations of the General Assembly, 22 Pac. 464, 13 Colo. 316; LeFebre v. Callaghan (Ariz.) 263 Pac. 589.

The Mann opinion construed articles 4351 and 4351a, V.T.C.S., both of which remain in force. Article 4351 permits the Governor to approve "deficiency claims," which approval will authorize (but not compel) the Comptroller to issue "deficiency warrants" to pay the claims. Article 4351a limits the amount of such deficiency warrants to $200,000 in the aggregate. See Fort Worth Cavalry Club v. Sheppard, 83 S.W.2d 660 (Tex. 1935). Cf. Terrell v. Middleton, (concurring opinion), 191 S.W. 1138 (Tex. 1917) (written before article 4351a was enacted). Attorney General Opinion O-2118 said at 5:

> There can be no casual deficiency of revenues, such as we are considering, except with respect to those purposes for which there has been made a specific appropriation. It is obvious, therefore, that the Legislature did not intend to confer upon the Governor authority to approve the issuance of deficiency warrants to finance a project which the Legislature considered, or might have considered, during its session, and failed or refused to appropriate money for.

Thus, shortly before section 49a was proposed as an amendment, it was the opinion of this office that section 49 prohibited the creation of debt to cure unexpected, unforeseen "casual deficiencies in the revenue" in an amount greater than $200,000. Undoubtedly, the drafters of the proposal to add section 49a to the constitution had that situation in mind. Notwithstanding that construction of section 49, however, the section had proved (and was shortly to prove again) unable to stop the flow of red ink.

The impotence of section 49 before the adoption of section 49a is demonstrated by the case of King v. Sheppard, 157 S.W.2d 682 (Tex. Civ. App. - Austin 1941, writ ref'd w.o.m.), decided a few months after Attorney General Opinion O-2118 was issued, and a few months before the voters adopted section 49a. In the King case, the legislature had appropriated $1,500,000 from the General Revenue Fund for expenditures related to the acquisition of Big Bend National Park. The suit was one to enjoin the Comptroller from paying out the money because, inter alia, a deficit of approximately $27,000,000 existed in

that fund.  The Court, although observing that section 49 inhibited the creation of a debt to supply revenue deficiencies in excess of $200,000, nevertheless declared:

> It is stipulated that there is a deficit of approximately $27,000,000 in the General Revenue Fund.  No showing is made that the appropriation exceeds the anticipated revenues for the year; and the authorities hold that no debt is created unless the appropriation is made or obligation is created in excess of the reasonably anticipated revenues for the year.  (Citations omitted). Furthermore, if it should be assumed that the appropriations for the year are in excess of the anticipated revenues for the year, the bill does not provide which of the items should be excluded. Obviously, the existence of the deficit alone cannot render the Legislature powerless to make appropriations for the operation of the government.  Nor does the fact that the Legislature has permitted a large deficit to accumulate in this particular fund prohibit it from making appropriations for the current year operation of the government.

King v. Sheppard, 157 S.W.2d at 685-86.

The ineffectiveness of section 49 to prevent resort to deficit spending was the result of its lack of an enforcement mechanism.  As indicated in King, no adequate showing could be made that an appropriation exceeded the anticipated revenues for the year, or, as to which items should be excluded if it did.  The adoption of section 49a in 1942 was designed to correct that situation.  Cf. Johnson v. Ferguson, 55 S.W.2d 153 (Tex. Civ. App. - Austin 1932, writ dism'd); Ferguson v. Johnson, 57 S.W.2d 372 (Tex. Civ. App. - Austin 1933, writ dism'd).

Section 49a, of article III, of the Texas Constitution consists of three paragraphs:

> Sec. 49a.  It shall be the duty of the Comptroller of Public Accounts in advance of each Regular Session of the Legislature to prepare and submit to the Governor and to the Legislature upon its convening a statement under oath showing fully the financial condition of the State Treasury at the close of the last fiscal period and an estimate of the probable receipts and disbursements for the then current fiscal year.  There shall also be contained in said statement an itemized estimate of the anticipated revenue based on the

> laws then in effect that will be received by and
> for the State from all sources showing the fund
> accounts to be credited during the succeeding
> biennium and said statement shall contain such
> other information as may be required by law.
> Supplemental statements shall be submitted at any
> Special Session of the Legislature and at such
> other times as may be necessary to show probable
> changes.

> From and after January 1, 1945, save in the
> case of emergency and imperative public necessity
> and with a four-fifths vote of the total member-
> ship of each House, no appropriation in excess of
> the cash and anticipated revenue of the funds from
> which such appropriation is to be made shall be
> valid. From and after January 1, 1945, no bill
> containing an appropriation shall be considered as
> passed or be sent to the Governor for considera-
> tion until and unless the Comptroller of Public
> Accounts endorses his certificate thereon showing
> that the amount appropriated is within the amount
> estimated to be available in the affected funds.
> When the Comptroller finds an appropriation bill
> exceeds the estimated revenue he shall endorse
> such finding thereon and return to the House in
> which same originated. Such information shall be
> immediately made known to both the House of
> Representatives and the Senate and the necessary
> steps shall be taken to bring such appropriation
> to within the revenue, either by providing
> additional revenue or reducing the appropriation.

> For the purpose of financing the outstanding
> obligations of the General Revenue Fund of the
> State and placing its current accounts on a cash
> basis the Legislature of the State of Texas is
> hereby authorized to provide for the issuance,
> sale, and retirement of serial bonds, equal in
> principal to the total outstanding, valid, and
> approved obligations owing by said fund on
> September 1, 1943, provided such bonds shall not
> draw interest in excess of two (2) per cent per
> annum and shall mature within twenty (20) years
> from date. (Emphasis added).

The purpose for the enactment of section 49a is discussed in 1 Braden, The Constitution of the State of Texas: An Annotated and Comparative Analysis 207 (1977). The explanation of section 49a notes that:

> Section 49a was proposed in 1941 as a device
> designed to stop deficit financing. The amendment
> was adopted at the general election in 1942 by a
> vote of 96,418 to 72,816. Four other amendments
> voted upon at the same election were defeated.
>
> . . . .
>
> Texans say that their constitution embodies a
> 'pay-as-you-go' philosophy. When applied to the
> prohibition on incurring debt, the expression is
> not wholly accurate. Section 49 means in effect
> that only the voters may put the state into debt.
> Section 49a is the embodiment of a 'pay-as-you-go'
> philosophy. The section says, in effect, 'Don't
> spend more than your income; don't slip into debt
> accidentally.'
>
> Actually, Section 49 embodies the same phi-
> losophy as far as the legislature is concerned.
> That is, in order to reserve to the people the
> decision on whether to go into debt, Section 49
> forbids a casual deficit of more than $200,000.
> Section 49a is an attempt to force the legislature
> to obey the command of Section 49. It is the
> addition of an enforcement device that is evidence
> of devotion to 'pay as you go'. . . .

The purpose and meaning of section 49a were also addressed by
Attorney General Mann shortly after the amendment was adopted. In
Attorney General Opinion O-5135 (1943), issued on March 27, 1943,
following adoption of the amendment the previous November, he answered
an inquiry from the Chairman of the State Affairs Committee of the
House of Representatives that read:

> The import of this amendment is to place the
> State on a cash basis. The language of the second
> paragraph appears to restrict future appropria-
> tions (after January 1, 1945) to cash on hand or
> to revenue anticipated to be received during the
> succeeding biennium. Paragraph three authorizes
> the issuance of bonds 'for the purpose of
> financing the outstanding obligations of the
> General Revenue Fund of the State and placing its
> current accounts on a cash basis.'
>
> Assuming 'cash basis' to mean that actual cash
> shall be available some time within the succeeding
> biennium to pay items of expense for which an
> appropriation has been made, will you please
> advise this committee whether or not the

provisions of Article 3, section 49a mandatorily require the State to operate on a 'cash basis' from and after January 1, 1945?

Responding, Attorney General Mann said in Attorney General Opinion O-5135 at 4-5:

> That the Legislature in submitting the amendment (and the people in voting for it) intended that the purpose was to place the State on a cash basis is manifest from the language of the form of ballot contained in the resolution (H.J.R. No. 1) submitting the amendment, which form of ballot for those in favor of the adoption of the amendment reads as follows:
>
> > 'For the Amendment to the Constitution of the State of Texas, requiring appropriation bills passed by the Legislature to be presented to and certified by the Comptroller as to available funds for payment thereof, limiting appropriations to the total of such available funds, providing for issuance of bonds to pay off State obligations outstanding September 1, 1943, and fixing the duties of the Legislature and Comptroller of Public Accounts with reference thereto.'

The opinion continued:

> In construing a constitutional provision it should be construed as it was understood by the average voter when he cast his ballot for or against it. As said by Judge Gaines, in Brady vs. Brooks, 89 S.W. 1052, 'The voters, as a rule, are unlearned in law and, as persons of this class would reasonably construe the Constitution upon which they vote, such ought to be the construction of the courts.'
>
> Applying that rule to the meaning of Section 49a, Article 3, the voters evidently understood that the purpose of the amendment was to limit the authority of the Legislature to appropriate money in excess of the cash and anticipated revenues, or, in other words, the average voter understood that its purpose was to place the State on a cash basis.
>
> The language of the second paragraph of the amendment is clear that no appropriation in excess

of the cash and anticipated revenue of the funds from which such appropriation is made shall be valid, with one exception only, to wit, '. . . save in case of emergency and imperative public necessity and with a four-fifths vote of the total membership of each house. . . .' (Emphasis added).

Several other Attorney General Opinions have also concluded that the amendment mandatorily requires the state "to operate on a 'cash basis' from and after January 1, 1945." See Attorney General Opinions O-6738A (1946); V-208 (1947); M-66 (1967).

Although a number of Attorney General Opinions have considered the operation and effect of section 49a in the 45 years since its adoption, the only case to come before the courts involving section 49a has been Texas Public Building Authority v. Mattox, 686 S.W.2d 924 (Tex. 1985). That case involved bonds the Attorney General had refused to certify because, among other things, he considered them part of a plan to finance state operations on a credit basis in violation of section 49a. The Texas Supreme Court took a different view, declaring:

> We next consider whether the Act and the bond issuance violate article III, section 49a. That section provides that no appropriation bill can become law unless and until either the Comptroller of Public Accounts certifies that there will be sufficient anticipated revenues to meet the appropriation or the Legislature passes the bill by a four-fifths majority of each house. Because all future appropriations for the payment of rental by the Commission in accordance with the lease agreement will be subject to the procedures outlined in article III, section 49a, neither the Act nor the Lease Agreement constitutes a violation of this constitutional provision. In the absence of sufficient appropriations to pay future rentals, the Authority has the right under the Lease Agreement to terminate the lease. There are, at present, some seven million dollars in the State Lease Fund to pay rental fees as they become due. The Attorney General cites us to no authority supporting his assertions that the Act or Lease Agreement violates article III, section 49a, and we are satisfied that this appropriation and future appropriations to the State Lease Fund have and will satisfy the procedural requirements of article III, section 49a.

686 S.W.2d at 928.

The Supreme Court held that, article III, section 49a was not violated because the amount currently appropriated for the purposes of the statute at issue was within the amount already available in the affected fund from which such appropriation was to be made, and because future appropriations would not be certified unless, at such times, the fund contained sufficient moneys to satisfy the additional appropriations.

The Attorney General had contended in the Building Authority case that the Act was inconsistent with the requirement in sections 49 and 49a that state government be operated on a "cash basis" as contrasted with a "credit basis" fiscal policy and that the legislature created the Texas Public Building Authority as a means to circumvent the constitutional prohibition against deficit financing. In a time of anticipated revenue shortages, the legislature had enacted article 601d, V.T.C.S., for the purpose of financing future major construction projects without appropriating the funds to pay for those projects. The Supreme Court, in a unanimous vote, sanctioned this legislation.

Despite this office's disagreement with the Court's interpretation of sections 49 and 49a, this office is not at liberty to ignore the opinion of the Court and its less than strict construction of sections 49 and 49a in analyzing the question before us.

The constitutional provision added in 1942 does not use the term "debt." Section 49a speaks, instead, of "outstanding obligations" and "placing its current revenues on a cash basis." It introduces a new element into the transactional equation: the Comptroller's statements and estimates.

The Comptroller of Public Accounts carried out his responsibility under section 49a by submitting to the 69th Legislature, in advance of its regular session in 1985, "an itemized estimate of the anticipated revenues based on the laws then in effect that will be received by and for the State from all sources showing the fund accounts to be credited during the succeeding biennium." The regular session of the 69th Legislature adopted, in conformity to the Comptroller's revenue estimates, a balanced budget. A combination of unforeseen circumstances, triggered in large measure by a sharp decline in oil prices which began in late 1985 and resulted in a full-blown economic recession in the statewide economy, produced a situation, unparalleled in recent Texas history, in which it quickly became clear that the original revenue estimates would fall considerably short of those forecast at the beginning of 1985.

Article 49a requires the Comptroller to submit "supplemental statements. . . . at any special session of the Legislature and at such other times as may be necessary to show probable changes [in the original revenue estimate]." The duty to submit supplemental statements to the Governor, as the chief executive officer of the state, is not limited to times when the legislature is in session or

to times immediately prior thereto. It is his duty to submit them whenever, in his opinion, it is necessary to show "probable changes."

Attorney General Mann noted in Attorney General Opinion O-5135 (1943) at 5, that "Section 49a imposes a duty upon the Comptroller which requires no legislation to make it effective." See also Attorney General Opinion M-66 (1967). The section is self-enacting. In our opinion, the legislature cannot control by statute the times or method utilized by the Comptroller to determine the condition of the treasury or whether an appropriation bill exceeds the anticipated revenue of the fund from which the appropriation is to be paid, although that officer may be subject to mandamus in the event he should fail to perform his duty as contemplated by the constitution. Jernigan v. Finley, 38 S.W. 24 (Tex. 1896). Cf. V.T.C.S. art. 4393-1, §3.043(k); Jessen Associates, Inc. v. Bullock, 531 S.W.2d 593, 602 (Tex. 1976).

In Attorney General Opinion WW-640 (1959), Attorney General Will Wilson considered the constitutionality of a bill that, among other things, attempted to control the Comptroller's estimates of the outstanding but undisbursed appropriations to be expected at the end of a biennium. The opinion concluded, "Insofar as this bill attempts to make estimates it is unconstitutional as a legislative invasion of the duties of the comptroller."

The bill at issue there, with the offending provision "making estimates" deleted, became article 4348a, V.T.C.S., still extant. The remainder of the bill, in the form it was considered by Attorney General Wilson, was characterized as an instruction to the Comptroller "to use the cash accounting basis" and was pronounced constitutional inasmuch as, according to the opinion:

> Reading Section 49a of Article III from its four corners, it is our opinion that this constitutional provision contemplates that the Comptroller, in making his estimate for certification of bills, use the cash accounting method.

Thus, article 4348a, V.T.C.S., is to be read not as a legislative mandate defining the power of the Comptroller under section 49a with respect to certifications or estimates made for that purpose, but, rather, as a direction that he conform to the requirements of section 49a itself by using the cash accounting method in arriving at his estimates for that purpose.

The Comptroller fulfilled his constitutional duty under article 49a by revising his revenue estimates downward, beginning in early 1986 and continuing throughout the year. Prior to and during the first and second called sessions of the 69th Legislature, he advised the governor and the legislature of an anticipated shortfall of substantial proportions for the current biennium. Nevertheless, the

legislature adjourned the special session in September, 1986, with the knowledge that expenditures would in all probability substantially exceed revenues. Prior to and during this, the 70th Session of the Legislature, the Comptroller again advised the Governor and the Legislature of an anticipated shortfall of substantial proportions.

It has never been assumed, however, that no deficit could ever occur in the accounts of the state after the adoption of section 49a or, if one did occur, that it could not be carried forward to the next fiscal period. In fact, the third paragraph of section 49a, speaking in 1942, contemplated the existence of a deficit in the General Revenue Fund as of September 1, 1943. To retire the expected deficit, it authorized the sale of bonds in an amount equal to the actual deficit on that date, but without assurance that the bonds could be sold (on the basis permitted) in time to eliminate the shortage before January 1, 1945, the date "from and after" which the accounts of the state were to be put on a cash basis.

That possibility was also addressed by Attorney General Mann in Attorney General Opinion O-5135 (1943) to Chairman Manford of the House State Affairs Committee. The Chairman posed to him the following:

> If, however, the State is required to go on a 'cash basis' from and after January 1, 1945 the question arises as to the future status of outstanding and unpaid warrants as compared with that of warrants issued after that date. Paragraph one of the amendment above quoted required [sic] the Comptroller in advance of each Session of the Legislature to estimate funds that will be available for appropriation during such Session and for the succeeding biennium. Our question is will the Comptroller be required to take into consideration the total outstanding unpaid warrants in determining the net amount of cash that will be available for appropriation for the succeeding biennium? In other words, will the net amount available for appropriation be the gross anticipated revenue for the succeeding biennium less the total amount of warrants outstanding and unpaid that were issued prior to the date of such estimate?
>
> For example, assume that on January 1, 1945 the General Fund Revenue anticipated for the succeeding biennium together with cash on hand totals $36,000,000.00, and that the total warrants then outstanding amount to $26,000,000.00, would the Comptroller be required to deduct the unpaid warrants before certifying the amount of cash that

would be available, to wit: $10,000,000.00, or
could he disregard all previously issued warrants
and certify $36,000,000.00 as the net amount
available for appropriation?

The answer given by Attorney General Mann demonstrated his
contemporaneous understanding of the amendment's effect:

In reply to your second question we think the
Comptroller will necessarily have to take into
consideration the total outstanding warrants in
determining the net amount of cash that will be
available for appropriation; otherwise, it would
be impossible to place the State on a cash basis.
If the anticipated revenues for the biennium
beginning January 1, 1945, should be estimated at
$36,000,000 and the Legislature should appropriate
$36,000,000 [sic] the outstanding warrants would
necessarily have to be paid in the order of their
registration and at the end of the biennium there
would be outstanding approximately the same amount
of warrants as in the beginning, and the State
would not be on a cash basis. The financial
situation would not be changed.

As originally drafted, Attorney General Opinion O-5135 contained
an additional paragraph which concluded that unless, prior to that
date, the legislature enacted legislation to refund obligations owing
by the General Revenue Fund on September 1, 1943, it could not be
done. The paragraph was deleted before the opinion was issued. A
memorandum dated March 26, 1943 in the file recommending the deletion
observed, inter alia:

As a practical matter it is impossible for the
Legislature during the present session (unless it
lasts until after September 1st) 'to enact
necessary legislation,' because no one knows, or
can know, now the amount of deficiency in the
general fund on September 1, 1943. The falling
off in State revenue and the rate of expenditures
between now and then will determine that.

The effect of revenue shortfalls on appropriation bills certified
by the Comptroller as being within estimated revenues anticipated to
be available for their payment was considered by Attorney General
Grover Sellers in Attorney General Opinion Nos. O-6497 and O-6497A
(1945). These questions were posed:

Should the appropriation by the legislature be
within the Comptroller's estimate as filed under
oath with the Governor, and if it subsequently

> should develop that for some unforeseen cause the sources of revenue should diminish to the point that it would not meet the appropriation, would the deficit thus created be a legal obligation upon the State?
>
> Should the appropriation be within the [C]omptroller's estimate and it should subsequently [develop] that the revenue fails to meet the appropriation, should the [C]omptroller issue warrants to meet the appropriation even though the revenue is exhausted and would such warrants be paid when sufficient revenue is secured to meet such warrants?

Attorney General Sellers answered each of the above questions in the affirmative, indicating his belief that after bills have become law, a deficit occurring as a result of conditions not anticipated by the Comptroller's estimate at the time they were certified will not affect their validity, although the miscalculation may require the issuance of deficiency warrants.

A 1986 publication of your office noted:

> An article on the pay-as-you-go amendment published in the 1940's, just after it was adopted, said that if estimates changed after appropriations were certified -- the current situation -- the appropriations apparently would still be valid.
>
> What makes 'pay as you go' work is the fact that before each new biennium, a new revenue estimate is rolled out. In making this new estimate, the Comptroller takes expected revenues in the upcoming two years and <u>adds</u> any expected surplus from the preceding budget period or <u>subtracts</u> any deficit.

<u>Interfund Borrowing In Texas State Finances</u>, 6 (Feb. 1986).

We believe this procedure is the proper one for determining what amount of appropriations, if any, the Comptroller may properly certify under article III, section 49a, of the Texas Constitution for the 1988-89 biennium. If the Comptroller estimates or certifies that a deficit of one billion dollars in the General Revenue Fund will exist at 12:00 midnight, August 31, 1987, but anticipates the receipt in that fund of twenty billion dollars in unencumbered revenue during the 1988-89 biennium, there will be nineteen billion dollars for use and certification during the biennium available according to that estimate.

If, on the other hand, the Comptroller estimates that a deficit will exist in that fund at 12:00 midnight on August 31, 1987, which exceeds anticipated unencumbered revenues during the succeeding biennium, no funds will be available for certification. Thus, in our opinion, there is no constitutional provision which forbids carrying an expected deficit forward to the next fiscal period. Cf. Attorney General Opinion WW-102 (1957) ["Section 49(a) does not prohibit deficit financing".]

I believe a caveat is in order. The Comptroller has carried out his constitutional responsibility of advising the Governor and Legislature of anticipated revenue shortfalls. The Texas Constitution imposes upon each member of the legislature a duty to refrain from engaging in deficit financing. Failure of the legislature to prevent deficit financing could cause the kind of financial problems that the people spoke out against with the passage of sections 49 and 49a of article III of the Texas Constitution. While I may be powerless to prevent this deficit financing, I feel it is my duty not to yield our constitutional heritage of a balanced budget without registering my protest.

## S U M M A R Y

Sections 49 and 49a of article III, of the Texas Constitution are related. Neither section expressly forbids carrying forward a deficit from one fiscal period to another. If a deficit is carried forward from one biennium to another, the deficit should be deducted from expected revenues for the new biennium in determining what funds are available during the new biennium for appropriation and certification under section 49a.

Very truly yours,

JIM MATTOX
Attorney General of Texas

JACK HIGHTOWER
First Assistant Attorney General

MARY KELLER
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General